**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

|  |  |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, and LAWRENCE MWETHUKU, *on behalf of themselves and all individuals similarly situated*, | : : : : : : |
| Plaintiffs, | : Civil Action No. 3:17-cv-495-MHL : |
| v. | : : |
| PLAIN GREEN, LLC, and GREAT PLAINS LENDING, LLC, | : : : |
| Defendants. | : : |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAIN GREEN, LLC'S MOTION TO DISMISS THE COMPLAINT WITHOUT LEAVE TO AMEND OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**</u>

## TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................ 1

II.  Background ................................................................................................ 3

III. Argument .................................................................................................. 7

   A.   Plain Green is Immune from Suit in this Court .................................. 7

      1.   The Chippewa Cree Tribe Maintains Sovereign Immunity from
           Suit as a Federally Recognized Indian Tribe. ........................... 7

      2.   Plain Green is Immune from Suit as an Economic Arm of the Tribe ......... 8

         a.   In Assessing the *Breakthrough* Factors, the Court Must
              Focus on Facts at the Time of Filing, Not at Some Prior
              Date When the Court Was Not Asked to Exercise its
              Jurisdiction ................................................................. 10

         b.   All Six *Breakthrough* Factors Weigh in Favor of Extending
              Immunity to Plain Green ................................................ 14

         c.   Plain Green's Sovereign Immunity Was Not Waived or
              Abrogated by Congress .................................................. 18

   B.   This Matter Must be Submitted to Arbitration ................................... 21

      1.   The Arbitration Agreement ...................................................... 21

      2.   Every Issue in this Litigation Must be Submitted to Arbitration ............ 23

      3.   The Arbitration Agreement is Valid and Enforceable ........................ 27

      4.   If the Court Determines that Any Provision is Unenforceable, that
           Provision Must be Severed and the Remainder of the Agreement
           Must Be Enforced ................................................................. 31

   C.   Additional Bases for Dismissal ....................................................... 32

      1.   This Case Should be Dismissed Because Venue in this District is
           Not Proper ......................................................................... 32

      2.   This Case Must be Dismissed For Failure to State a Claim under
           Federal Rule of Civil Procedure 12(b)(6) .................................. 33

         a.   Plaintiffs' Claims Must Be Dismissed as a Matter of Law
              in Light of the Virginia Supreme Court's Decision in
              *Settlement Funding* ....................................................... 33

         b.   Additional Pleading Deficiencies with Plaintiffs' RICO
              Claims ............................................................................ 38

IV.  Conclusion ............................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355 (4th Cir. 2012).........................27

*Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013)....................................22, 29, 31

*Am. Indian Agr. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374 (8th Cir. 1985)..........................................................................................................9

*Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680 (8th Cir. 2011) ..................7, 18

*Atl. Marine Constr. Co. v. United States District Ct.*, 134 S. Ct. 568 (2013)...............33

*Bank of Hemet v. United States*, 643 F.2d 661 (9th Cir. 1981) .................................11, 12

*Banks v. CashCall, Inc.*, 188 F. Supp. 3d 1296 (M.D. Fla. 2016) ................................26

*Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343 (2d Cir. 2000)...........................19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................32

*Breakthrough Mgmt Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010)......................................................................9, 10, 12, 15, 16

*Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385 (4th Cir. 2004) ...................10

*Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043 (E.D. Wis. 1999).........................19

*Carson v. Giant Food, Inc.*, 175 F.3d 325 (4th Cir. 1999) ....................................25, 26

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) .........................................................7

*Contrast Peabody Holding Co., LLC v. UMW*, 665 F.3d 96 (4th Cir. 2012) ...............26

*Cook v. AVI Casino Enters.*, 548 F.3d 718 (9th Cir. 2008) ........................................9

*Demontiney v. U.S. ex rel. Dept. of Interior, Bureau of Indian Affairs*, 255 F.3d 801 (9th Cir. 2001) ..........................................................................................................8

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017)..........................5, 26, 27, 29, 30

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)................................................12, 13

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) .............................................................37

*Everette v. Mitchem*, 146 F. Supp. 3d 720 (D. Md. 2015)........................................12

*Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126 (11th Cir. 1999) ..........................................................................................................19

*Furry v. Miccosukee Tribe of Indians of Florida*, 685 F.3d 1224 (11th Cir. 2012) ...................20

*Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677 (8th Cir. 2001)..............................................31

*Gingras v. Rosette*, No. 15-101, 2016 U.S. Dist. LEXIS 66833 (D. Vt. May 18, 2016)...............5

*Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396 (S.D. Fla. 2014) ..........................23, 28

*Haile v. Saunooke*, 246 F.2d 293 (4th Cir. 1957) .........................................................................8

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) .......................................................30

*Hawthorne v. BJ's Wholesale Club*, No. 15-572, 2016 U.S. Dist. LEXIS 114969 (E.D. Va. Aug. 26, 2016)..............................................................................................21, 24, 29

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016)........................................5, 26, 29, 30

*Healy v. Beer Inst.*, 491 U.S. 324 (1989) .....................................................................................37

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999).................................30, 35

*Howard ex rel. United States v. Shosone-Paiute Tribes of the Duck Valley Indian Reservation*, No. 13-16118, 2015 U.S. App. LEXIS 10040 (9th Cir. June 15, 2015).............38

*Howard v. Plain Green LLC*, No. 17-302, 2017 U.S. Dist. LEXIS 136275 (E.D. Va. Aug. 24, 2017) .......................................................................................................................1, 14

*Howard v. Plain Green, LLC*, No. 17-302, 2017 U.S. Dist. LEXIS 137229 (E.D. Va. Aug. 7, 2017) ................................................................................................... passim

*Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701 (2003)........................................................................................................................38

*Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225 (10th Cir. 2010) ......................................11

*James Joseph Morrison Consultants, Inc. v. Sault Ste. Marie Tribe of Chippewa Indians*, No. 97-315, 1998 U.S. Dist. LEXIS 13653 (W.D. Mich. Aug. 6, 1998) ...............................20

*Johnson v. Ace Cash Express, Inc.*, No. 13-1186, 2014 U.S. Dist. LEXIS 100857 (D. Del. July 24, 2014)........................................................................................................................28

*Jones v. Bank of Am. Corp.*, No. 09-162, 2010 U.S. Dist. LEXIS 142918 (E.D. Va. Aug. 24, 2010) .......................................................................................................................37

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ....................................................................11

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998) ..............................8, 9, 18, 19, 20

*Leigh v. Blackfeet Tribe of Blackfeet Indian Reservation*, No. 89-1568, 1990 U.S. Dist. LEXIS 11026 (D. Mass. Aug. 17, 1990) .................................................................................20

*Lewis v. Clarke*, 137 S. Ct. 1285 (2017)..........................................................................................12

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978)................................36

*Massi v. Lomonaco*, No. 10-265, 2010 U.S. Dist. LEXIS 58103 (D.S.C. May 25, 2010) ...........32

*Maysonet-Robles v. Cabrero*, 323 F.3d 43 (1st Cir. 2003)............................................................11

*Meena Enters. v. Mail Boxes Etc., Inc.*, No. 12-1360, 2012 U.S. Dist. LEXIS 146406 (D. Md. Oct. 11, 2012)............................................................................................................................25

*Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024 (2014) ............................................8, 13, 20

*Montana v. United States*, 450 U.S. 544 (1981) .............................................................................33

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ..........................23

*O'Neil v. Hilton Head Hosp.*, 115 F.3d 272 (4th Cir. 1997) .........................................................23

*Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505 (1991)...............7, 8

*Pan Am. Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416 (9th Cir. 1989) ...........................7

*Parnell v. CashCall, Inc.*, 804 F.3d 1142 (11th Cir. 2015) ..........................................................26

*Pettus v. Servicing Co., LLC*, No. 15-479, 2016 WL 7234106 (E.D. Va. Feb. 9, 2016)................8

*Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394 (4th Cir. 1999)............................................7

*Puyallup Tribe v. Dept. of Game of State of Wash.*, 433 U.S. 165 (1977) ......................................7

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) ...........................................23, 24, 25, 26

*Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765 (4th Cir. 1991) ..................................................................................................................................................7

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)..........................................................7, 8, 18

*Settlement Funding, LLC v. Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007) ........2, 30, 33, 35, 36, 37

*SFL+A Architects, PA v. Marlboro Cty. Sch. Dist.*, No. 13-03071, 2014 U.S. Dist. LEXIS 119905 (D.S.C. Aug. 28, 2014) ....................................................................................................33

*Smith v. Babbitt*, 875 F. Supp. 1353, 1365 (D. Minn. 1995) ........................................................19

*State ex rel. Suthers v. Cash Advance*, No. 05-143, 2012 WL 3113527 (Denver Cty. Dist. Ct. Feb. 18, 2012) .........................................................................................11, 12

*Stewart v. Lee*, No. 116-213, 2017 U.S. Dist. LEXIS 40012 (E.D. Va. Mar. 17, 2017) ..............10

*Stewart v. Legal Helpers Debt Resolution, LLC*, No. 11-26, 2012 U.S. Dist. LEXIS 76168 (W.D.N.C. June 1, 2012) ...........................................................................28

*Stolt-Nielsen S. A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662 (2010)...........................................24

*Stoner v. Santa Clara Cnty. Office of Ed.*, 502 F.3d 1116 (9th Cir. 2007)...................................38

*SunTrust Bank v. Vill. at Fair Oaks Owner, LLC*, 766 F. Supp. 2d 686 (E.D. Va. 2011).........7, 18

*Tassone v. Foxwoods Resort Casino*, No. 11-1718, 2012 U.S. Dist. LEXIS 71882 (D. Conn. May 23, 2012) ...................................................................................................20

*Thomas v. Dugan*, No. 97-2717, 1998 U.S. App. LEXIS 32675 (4th Cir. 1998)...........................8

*Thornton v. First Nat'l Bank Credit Card*, No. 12-0492, 2012 U.S. Dist. LEXIS 136049 (S.D. W. Va. Sep. 24, 2012) .........................................................................25, 26

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.*, 476 U.S. 877 (1986).........................................................................................................13

*United States v. Wheeler*, 435 U.S. 313 (1978) .............................................................................7

*Verizon Online Servs. v. Ralsky*, 203 F. Supp. 2d 601 (E.D. Va. 2002).......................................32

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000).......................38

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).....................................20, 36, 37

*Williams v. Lee*, 358 U.S. 217 (1959) ....................................................................................33, 36

*Worcester v. Georgia*, 31 U.S. 515 (1832) ....................................................................................7

*Zaklit v. Glob. Linguist Sols., LLC*, No. 14-314, 2014 U.S. Dist. LEXIS 92623 (E.D. Va. July 8, 2014)..............................................................................................................30

## STATUTES, REGULATIONS, AND COURT RULES

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) ...................................................23, 24, 27, 30, 31

Racketeer Influenced and Corrupt Organizations. Act (18 U.S.C. § 1961 *et seq.*) .........................

....................................................................................3, 5, 19, 20, 33, 34, 37, 38

Indian Reorganization Act of 1934 (25 U.S.C. § 461 *et seq.*) .......................................................3

28 U.S.C. § 1367 ...................................................................................................20

28 U.S.C. § 1391 ...................................................................................................32

Federal Rule of Civil Procedure 12(b)(1) ............................................................7

Federal Rule of Civil Procedure 12(b)(3) ....................................................32, 33

Federal Rule of Civil Procedure 12(b)(6) ...........................................................33

Federal Register List Indian Entities Recognized and Eligible to Receive Services from
    the United States Bureau of Indian Affairs (81 Fed. Reg. 26826) ...........................4

Chippewa Cree Tribal Lending and Regulatory Code.................................4, 28, 34, 36

Virginia Code § 6.2-305(A) ..................................................................................33

**OTHER AUTHORITIES**

"Chippewa Cree Tribe," Montana Governor's Office of Indian Affairs,
    https://tribalnations.mt.gov/chippewacree (last visited September 19, 2017). ........................3

2 Williston on Contracts § 6:62 (4th ed.)...............................................................33

Restatement (Second) of Conflict of Laws, § 188...................................................33

Defendant Plain Green, LLC ("Plain Green"), by its undersigned attorneys, respectfully submit this Memorandum of Law in support of its Motion to Dismiss without Leave to Amend, or, in the alternative, to Compel Arbitration of the Class Action Complaint ("Complaint") brought by named Plaintiffs Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, and Lawrence Mwethuku ("Plaintiffs").

## I. Introduction

Two of the five named Plaintiffs entered into loan agreements with Plain Green, a lending entity entirely owned and operated by the Chippewa Cree Tribe of the Rocky Boy's Reservation, Montana ("Tribe").  As disclosed in all capital letters on the first page of their loan agreements, and as Chief Judge Smith and Judge Miller recently ruled, this means "both the Tribe and Plain Green are immune from suit in any Court unless the Tribe . . . expressly waives that immunity."  (Gibbs Agreement at 1[1]); *Howard v. Plain Green LLC*, No. 17-302, 2017 U.S. Dist. LEXIS 136275 (E.D. Va. Aug. 24, 2017) (order approving Judge Miller's Report & Recommendation dismissing case against Plain Green on immunity grounds).  The Tribe has not waived its immunity, nor has Congress abrogated it.  Therefore, all Plaintiffs' claims, which generally allege that the loans' interest rates violate state and federal law, must be dismissed for lack of subject matter jurisdiction.

In an attempt to extinguish Plain Green's sovereign immunity, Plaintiffs attempt to paint Plain Green as a "criminal enterprise" that partnered with its former third-party service

---

[1]  Over the past several years, named Plaintiffs Gibbs and Mwethuku entered into substantially similar loan agreements with Plain Green.  (*See* Exhibit 2, Declaration of Plain Green COO Ian Stamper Windyboy ¶ 7 (hereinafter, "Windyboy Decl.") & Exhibits H through M (attached to the Windyboy Declaration).)  Plaintiffs have not alleged that the agreements differ in any significant way.  Accordingly, for ease of reference, when discussing Plaintiffs' loan agreements, Plain Green will refer only to the Gibbs loan agreement ("Gibbs Agreement"), which is attached to the Complaint as Exhibit 2 and to the Windyboy Declaration as Exhibit H.

provider, Think Finance, for the purpose of evading usury laws.  These allegations are false but also irrelevant.  In conducting its immunity analysis, the Court must consider Plain Green's operation and structure *at the time the case was filed* on July 11, 2017.  Plain Green no longer has a relationship with Think Finance or any other service provider and has a wholly different business structure as a manager-managed LLC (whose only member is the Tribe).  These facts—which are notably absent from the Complaint—plainly demonstrate that the Tribe's immunity from suit extends to Plain Green and bars this lawsuit.

Although Plaintiffs cannot proceed in this Court due to Plain Green's immunity, Plaintiffs are not without a remedy against Plain Green.  Their loan agreements—again in clear, comprehensive, and easy to understand language—spell out the process for resolving any disputes relating to the loans.  Specifically, each agreement contains a mandatory arbitration clause that requires Plaintiffs' federal and state law claims to be litigated before a neutral arbitrator of Plaintiffs' choosing—not in this Court.  (Gibbs Agreement at 6–8.)  This mandatory arbitration clause applies not only to Plaintiffs' claims concerning the interest rates that applied to their loans, but also their allegations that the loan agreements' arbitration and tribal choice of law provisions are unenforceable.  (*Id.*)  In sum, the arbitration agreement demands that everything at issue in the Complaint be submitted to arbitration.

If this case is not dismissed on immunity grounds or sent to arbitration, the loan agreements provide yet another reason why Plaintiffs cannot prevail as a matter of law.  The first page of each agreement contains a choice of law clause calling for the application of tribal law.  (Gibbs Agreement at 1–2.)  Virginia courts routinely permit parties to select which law they want to govern, including on matters such as which state's interest rate laws apply to a loan.  *See, e.g.*, *Settlement Funding, LLC v. Neumann-Lillie*, 645 S.E.2d 436, 438–39 (Va. 2007) (upholding loan

that exceeded Virginia's 12 percent interest rate cap because the parties' contract called for the application of Utah law, which did not have a cap). Chippewa Cree law does not have an interest rate cap. Because the loans' interest rates were consistent with tribal law, Plaintiffs have not plausibly alleged that the loans violated Virginia law or constituted an "unlawful debt" under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs cannot plead around this critical defect. As a result, the case must be dismissed with prejudice on this ground.

　　　　For these reasons, and on the basis of the additional grounds provided below, the Court must dismiss the action against Plain Green with prejudice or compel Plaintiffs to comply with the mandatory arbitration agreements that they have flouted by bringing this case.

## II.　　Background

　　　　This case concerns installment loans extended to five Virginia residents by Plain Green and the other defendant in this case, Great Plains Lending, LLC. Plain Green is a lending entity owned and operated by the Chippewa Cree Tribe, a federally-recognized Native American tribe in north-central Montana. The Tribe is an independent sovereign nation that provides governmental and social services, jobs, education, nutritional, health and infrastructure, among other services, to its approximately 7,000 members, 3,500 of whom live on the Reservation.[2] The Tribe's inherent sovereignty long predates the organization of the United States, and it has engaged in a government-to-government relationship with the United States for over 150 years. In 1934, the Tribe organized under a Constitution and Bylaws adopted under the provisions of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (25 U.S.C. § 461 *et seq.*), and has

---

[2]　"Chippewa Cree Tribe," Montana Governor's Office of Indian Affairs, https://tribalnations.mt.gov/chippewacree (last visited September 19, 2017); *see also* Ex. 1, Declaration of Tribe's Vice-Chairman Theodore Whitford ¶ 3 (hereinafter "Whitford Decl."). The exhibits referenced in the Vice-Chairman's declaration are attached thereto as Exhibits A through G.

since that time maintained a continuous government-to-government relationship with United States.  *See* 81 Fed. Reg. 26826, 26827 (May 4, 2016) (including the Tribe on the list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs").

In 2010, the Tribe's governing body, the Business Committee, chartered Plain Green as an online lending entity pursuant to the Committee's authority to promote the general welfare of the Tribe.  (Whitford Decl. ¶ 7; Ex. D at 1.)  Plain Green operates as an economic arm of the Tribe pursuant to the laws of the Tribe and is specifically designed to increase tribal revenues, to serve the social, economic, educational, and health needs of the Tribe, and to "enhance the Tribe's economic self-sufficiency and self-determination."  (Whitford Decl. ¶ 11; Ex. D at 1; Ex. E at 19.)  Plain Green fulfills this responsibility: the Tribe utilizes revenues from Plain Green to deliver direct-services—including healthcare, education, and subsistence distributions, among a variety of other programs and initiatives—to its Tribal members.  (Whitford Decl. ¶ 14.)

The Business Committee exercises significant and active operational control over Plain Green.   The Committee has authorized amendments to the Plain Green Articles of Organization three times since Plain Green's establishment in 2010.  (*Id*. ¶ 8; *see* Ex. E.)  Plain Green's profits inure to the benefit of the Tribe and Plain Green operates all facets of its business internally.  (Whitford Decl. ¶¶ 10, 13.)

Plain Green is also subject to regulation by the Tribe under the Chippewa Cree Tribal Lending and Regulatory Code, a true and correct copy of which is attached as Exhibit F to Vice Chairman Whitford's declaration and accessible on Plain Green's website at https://www.plaingreenloans.com/css/title10.pdf.  (*Id*. ¶ 15; Ex. F.)  The Code regulates a variety

-4-

of Plain Green's activities, including the extension of credit, application of usury and interest rates, and required loan agreement disclosures.  (*See* Whitford Decl., Ex. F at Chapter 3.)  It also requires Plain Green be subject to the oversight of the Tribal Consumer Protection Bureau ("TCPB"), an independent governmental regulatory subdivision of the Tribe.  (*See id.* at Chapter 4.)  This oversight includes quarterly compliance audits and an annual on-site review.  (*See id*. at §§ 10-4-108, 10-4-111.)

In light of Plain Green's status as an arm of the Tribe, the Tribe has affirmed that it and its officers share all of the "rights, privileges and federal immunities of the Tribe," including sovereign immunity from suit.  (Whitford Decl. ¶ 12; Ex. E at 5; *see also* Ex. D at 3.)

Notwithstanding Plain Green's sovereign immunity, Plaintiffs filed in this Court the instant putative class action Complaint, alleging principally that the interest rates applied on their loans violate Virginia lending laws, which impose a maximum interest rate of 12 percent, and RICO, which bars the collection of "unlawful debt"—i.e., money lent at twice the applicable enforcement rate.  18 U.S.C. § 1961(6).  This is an unprecedented maneuver.  In similar cases, including the Fourth Circuit cases that Plaintiffs rely on in their Complaint, plaintiffs seem to acknowledge that suing the tribes and their economic arms is a non-starter because of the immunities enjoyed by these entities.  *See, e.g.*, *Gingras v. Rosette*, No. 15-101, 2016 U.S. Dist. LEXIS 66833, at *1 (D. Vt. May 18, 2016) (substantially similar RICO case brought against the officers of Plain Green under *Ex Parte Young* because the "Tribe and Plain Green . . . are 'subject to sovereign immunity'"); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 332 (4th Cir. 2017) (substantially similar RICO case brought against a non-tribal service provider of a loan issued by a tribal lender); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016)

(private litigation relating to a loan issued by a tribal lender against only the servicing agent, which "claimed no tribal ownership or affiliation").

In an effort to avoid the straightforward application of tribal immunity principles, Plaintiffs alleged that Plain Green entered into a "rent-a-tribe" agreement with Think Finance. (Compl. ¶ 3.)  Plaintiffs' allegations are not only false but also irrelevant.  Rather than presenting this Court with jurisdictional facts that are contemporaneous with the filing, Plaintiffs present outdated facts that they believe will help them avoid the Plain Green's sovereign immunity.  But Plaintiffs' outdated alleged facts are irrelevant to an assessment of Plain Green's sovereign immunity *at the time the case was filed* on July 11, 2017.

While Plain Green's sovereign immunity from suit bars the Court's subject matter jurisdiction and precludes further inquiry into the matter, other significant threshold barriers exist that the Plaintiffs must, and cannot, overcome.  Plaintiffs Gibbs and Mwethuku entered into loan agreements with Plain Green that require all disputes between the parties to be resolved by arbitration—not by a lawsuit brought in federal district court—and mandate the application of tribal law to disputes brought in such proceedings.  (Compl. ¶¶ 7, 76–85; Gibbs Agreement at 1–2, 6–8.)  Much like needing to prove that Plain Green waived its tribal sovereign immunity, Plaintiffs must find a way to avoid these contractual obligations.  Here, Plaintiffs allege that the choice of law and arbitration clauses are "unconscionable and unenforceable" because, when read together, they purportedly "disclaim all federal and state law in favor of 'tribal law.'" (Compl. ¶¶ 7, 77–85.)  Simply put, Plaintiffs' bare allegations do not change the plain nature of their contractual undertaking any more than they can avoid Plain Green's sovereign immunity through stale facts.

## III.     Argument

### A.     Plain Green is Immune from Suit in this Court

Tribal sovereign immunity is a threshold jurisdictional question that must be addressed before the merits.  *Howard v. Plain Green, LLC*, No. 17-302, 2017 U.S. Dist. LEXIS 137229, at *5 (E.D. Va. Aug. 7, 2017) (explaining that "[w]hen an entity enjoys immunity from suit, the court lacks subject matter jurisdiction"); *see Puyallup Tribe v. Dept. of Game of State of Wash.*, 433 U.S. 165, 172 (1977) (stating that "[a]bsent an effective waiver or consent," a court "may *not exercise jurisdiction* over a recognized Indian tribe" (emphasis added)); *Pan Am. Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416, 418 (9th Cir. 1989) (explaining that "the issue of tribal sovereign immunity is jurisdictional in nature"); *see also Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 684-85 (8th Cir. 2011) ("We have held that tribal sovereign immunity is a threshold jurisdictional question.").  Here, Plain Green has presented indisputable factual evidence demonstrating that the Court lacks subject matter jurisdiction over Plaintiff's claims because Plain Green is immune from suit in this Court.[3]  Accordingly, the Court should dismiss Plaintiffs' Complaint without ordering jurisdictional discovery.

### 1.     *The Chippewa Cree Tribe Maintains Sovereign Immunity from Suit as a Federally Recognized Indian Tribe.*

The Chippewa Cree Tribe is a sovereign body politic with reserved, inherent authority that predates the United States Constitution.  *Worcester v. Georgia*, 31 U.S. 515, 559

---

[3] It is Plaintiffs' burden to establish that subject matter jurisdiction exists under Federal Rule of Civil Procedure 12(b)(1).  *SunTrust Bank v. Vill. at Fair Oaks Owner, LLC*, 766 F. Supp. 2d 686, 688 (E.D. Va. 2011) (citing *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999)).  In conducting this analysis, the Court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  The Court must grant Plain Green's Motion "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.*

(1832); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–59 (1978); *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978); *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991) (citing *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831)).

A core aspect of the Tribe's inherent sovereignty is sovereign immunity from unconsented suit.  *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (reaffirming that "[a]mong the core aspects of sovereignty that tribes possess—subject [only] to congressional action—is the 'common-law immunity from suit traditionally enjoyed by sovereign powers'" (quoting *Martinez*, 436 U.S. at 58)); *Demontiney v. U.S. ex rel. Dept. of Interior, Bureau of Indian Affairs*, 255 F.3d 801, 813 (9th Cir. 2001) (dismissing plaintiff's claim based on the Chippewa Cree Tribe's sovereign immunity from suit).  Indeed, "[t]he rule that a [federally-recognized] tribe of Indians . . . is not subject to suit without the consent of Congress is too well settled to admit of argument."  *Haile v. Saunooke*, 246 F.2d 293, 297 (4th Cir. 1957).

Further, tribal sovereign immunity is not geographically limited.  The Tribe retains its immunity even when it acts in a commercial capacity outside the boundaries of its territory.  *See Bay Mills*, 134 S. Ct. at 2036 (stating that the "doctrine of tribal immunity—without any exceptions for commercial or off-reservation conduct—is settled law and controls"); *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 760 (1998) (holding that tribal sovereign immunity extends to a tribe's "governmental or commercial activities" regardless of "whether they were made on or off a reservation").

2.    *Plain Green is Immune from Suit as an Economic Arm of the Tribe*

Tribal sovereign immunity extends to businesses that operate as economic arms of the Tribe.  *See Thomas v. Dugan*, No. 97-2717, 1998 U.S. App. LEXIS 32675, at *2–3 (4th Cir. 1998) ("Tribal entities and officers . . . are also shielded by sovereign immunity."); *Howard*, 2017 U.S. Dist. LEXIS 137229 at *7; *see also Okla. Tax Comm'n*, 498 U.S. at 510 (holding that

tribal sovereign immunity extends to "tribal business ventures"); *Pettus v. Servicing Co., LLC*, No. 15-479, 2016 WL 7234106, at *2 (E.D. Va. Feb. 9, 2016) ("Tribal sovereign immunity extends to an 'arm of the tribe' that engages in economic activities . . . ."); *Kiowa*, 523 U.S. at 757 (explaining that tribal sovereign immunity is retained even for those tribal businesses that had arguably "become far removed from tribal self-governance and internal affairs"); *see Cook v. AVI Casino Enters.*, 548 F.3d 718, 725 (9th Cir. 2008) (stating that "tribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a tribe itself"). Indeed, upholding tribal sovereign immunity for tribal commercial entities is consistent with a central purpose underlying immunity: "to promote economic development and tribal self-sufficiency." *Kiowa*, 523 U.S. at 757; *see also Am. Indian Agr. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1378 (8th Cir. 1985) (emphasizing that immunity is "necessary to promote the federal policies of tribal self-determination, economic development, and cultural autonomy").

Courts typically apply a multi-factor balancing test to analyze whether an entity is an arm of the Tribe entitled to the Tribe's sovereign immunity. The test articulated by the Tenth Circuit in *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort* has become the leading test because it utilizes central factors relied on by "the various tests used by federal courts, as well as state courts" over time. 629 F.3d 1173, 1187 n.10 (10th Cir. 2010). Judge Miller recently applied the *Breakthrough* test to Plain Green and concluded that Plain Green is entitled to sovereign immunity as an arm of the Tribe. *See Howard*, 2017 U.S. Dist. LEXIS 137229 at *7–8.

The *Breakthrough* test looks to the following factors in determining whether entities are arms of the tribe: (1) their method of creation; (2) their purpose; (3) their structure,

ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.  629 F.3d at 1181.  No single factor is dispositive, and not all factors need to weigh in favor of immunity for an entity to be an arm of the Tribe.  *See id.* at 1191–95.  Rather, the entity is immune if the weight of the factors weighs in favor of immunity.  *Id.*

          a.      <u>In Assessing the *Breakthrough* Factors, the Court Must Focus on Facts at the Time of Filing, Not at Some Prior Date When the Court Was Not Asked to Exercise its Jurisdiction</u>

Before addressing the application of the *Breakthrough* factors, Plain Green must first address a foundational defect permeating the Complaint.  In an effort to circumvent Plain Green's sovereign immunity, Plaintiffs advance a series of false factual allegations regarding Plain Green's operation and structure in support of their theory that Plain Green is not a true arm of the Tribe.  However, Plaintiffs' factual allegations are both misinformed and irrelevant under the *Breakthrough* test because they all purport to describe Plain Green's past operations and structure.  Because *past* facts have no bearing on the Court's *present* subject matter jurisdiction (and therefore, Plain Green's *present* immunity), this Court must disregard Plaintiff's false and temporally misplaced allegations in assessing whether Plain Green is an arm of the Tribe under *Breakthrough*.

As noted, tribal sovereign immunity is in the nature of subject matter jurisdiction, *Howard*, 2017 U.S. Dist. LEXIS 137229, at *5–6, and this Court is under a "continuous obligation" to ensure that it maintains subject matter jurisdiction over this matter.  *Stewart v. Lee*, No. 116-213, 2017 U.S. Dist. LEXIS 40012, at *14 n.4 (E.D. Va. Mar. 17, 2017) (citing *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004)).  The

arm of the tribe inquiry, then, is necessarily one in the present, asking whether the court can *currently* bind the tribal entity, or some prior iteration thereof, in light of its claimed immunity as an arm of the Tribe, without regard to whether the entity was entitled to immunity at some point in the past.   Thus, the arm-of-the-tribe inquiry is "trapped in the present" and looks to "the current state of affairs" without regard to whether the entity was entitled to immunity "at some earlier time."   *State ex rel. Suthers v. Cash Advance*, No. 05-143, 2012 WL 3113527 (Denver Cty. Dist. Ct. Feb. 18, 2012) (concluding that, "as the State conceded at the hearing, the [arm-of-the-tribe] issue in this particular case is trapped in the present" because "a court must always be concerned about its subject matter jurisdiction").   Regardless, Plain Green has always had sovereign immunity.

Indeed, the majority of federal circuits to address the issue have adopted the "time-of-filing" in evaluating tribal sovereign immunity, which provides that the existence of a defendant's sovereign immunity is assessed at the time the action is filed.   *See Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1236 (10th Cir. 2010) (recognizing the Second, Third, Fifth, and Ninth Circuits as adopting the "time of filing" such that sovereign immunity is assessed "as of the date the complaint was filed"); *see Bank of Hemet v. United States*, 643 F.2d 661, 665 (9th Cir. 1981) (holding that sovereign immunity "should be determined as of the date the complaint was filed").   This rule accords with "the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought."   *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (internal quotation marks omitted).   To the extent circuits deviate from this rule, they do so by permitting a reassessment of immunity *after* litigation has commenced, recognizing that subject matter jurisdiction is an *ongoing* inquiry.   *See Iowa Tribe of Kan. & Neb.*, 607 F.3d 1225, 1236 (10th Cir. 2010) (concluding that sovereign

immunity is not "a determination to be made based on the existence of a waiver at the time of filing," but "is an ongoing inquiry" that can change after a suit is commenced); *Maysonet-Robles v. Cabrero*, 323 F.3d 43 (1st Cir. 2003) (same).  The collective rule, then, is that sovereign immunity is assessed *at the earliest* when the action commences.  And although the "time of filing" rule has not been explicitly applied in the specific context of tribal sovereign immunity, "[t]here is no reason to depart from these general rules in the context of tribal sovereign immunity."  *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (applying "established sovereign immunity principles" to hold that tribal sovereign immunity is not implicated when a claim is made against tribal employees in their individual capacities).

Because the existence of sovereign immunity often involves fact-dependent inquiries, such as the presence of a waiver, the "time of filing" rule requires courts to assess facts relevant to immunity in existence at the time the action is filed.  *See Bank of Hemet*, 643 F.2d at 665 (stating that "the presence of a waiver" must be assessed at the time of filing).  In the context of an arm-of-the-tribe inquiry, this means that courts must look to the facts bearing on the *Breakthrough* factors as they exist at the time of filing—not when the alleged events giving rise to the claim occurred.  Indeed, consistent with the "time of filing" rule, the arm-of-the-tribe inquiry is and has always been an assessment of the entity's *current* structure and relationship to the subject tribe.  *Cash Advance*, 2012 WL 3113527 (explaining that irrelevance of past immunity is why the "arm-of-the-tribe factors are phrased in the present test"); *see also Breakthrough*, 629 F.3d. at 1191–96 (assessing the entity's *present* ownership status, structure, operation, and financial relationship with the tribe); *Everette v. Mitchem*, 146 F. Supp. 3d 720, 724-25 (D. Md. 2015) (same); *Howard*, 2017 U.S. Dist. LEXIS 137229 at *7–9 (same).

Notably, the Supreme Court specifically rejected the argument that the status of a defendant's sovereign immunity should be assessed at the time of the prior events giving rise to suit.  In *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), the petitioners argued that immunity conferred under the Foreign Sovereign Immunities Act should be administered like "other status-based immunities, such as the qualified immunity accorded a state actor, that are based on the status of an officer at the time of the conduct giving rise to the suit."  *Id.* at 478–79.  The Court rejected petitioners' argument, reasoning that the justification for conferring immunity to government officers—to "prevent threat of suit from crippling proper and effective administration of public affairs"—is different from that underlying immunity to foreign states. *Id.* at 479.  "Foreign sovereign immunity, by contrast, is not meant to avoid chilling foreign states or their instrumentalities in the conduct of their business but to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns."  *Id.*  As such, the Court concluded that the existence of immunity under the Foreign Sovereign Immunities Act is assessed at the time of filing.

Similarly, the doctrine of tribal sovereign immunity is "a necessary corollary to Indian sovereignty and self-governance."  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.,* 476 U.S. 877, 890 (1986).  And like the foreign sovereign immunity at issue in *Dole Foods*, continued recognition of tribal sovereign immunity is strongly supported by principles of comity.  *Bay Mills*, 134 S. Ct. at 2041 (Sotomayor, J., concurring) (stating that the goals of comity "are best served by recognizing sovereign immunity for Indian Tribes, including immunity for off-reservation conduct, except where Congress has expressly abrogated it").  Because the rationale for extending immunity to tribes parallels the rationale for extending immunity to foreign governments, the Court's conclusion in *Dole Foods*—that courts cannot

assess the existence of immunity based on the sovereign's status at the time of the prior conduct that gives rise to the suit—should control here.

Consistent with the "time of filing" rule and the Supreme Court's decision in *Dole Foods*, a determination of whether Plain Green is entitled to tribal sovereign immunity as an arm of the Tribe under *Breakthrough* requires an assessment of Plain Green's *current* operation and structure.  Plaintiffs' factual allegations regarding Plain Green's past operation and structure must therefore be disregarded as a matter of law.

> b.   All Six *Breakthrough* Factors Weigh in Favor of Extending Immunity to Plain Green

On August 24, 2017, Chief Judge Smith adopted Judge Miller's ruling that "Plain Green is an 'arm of the tribe' based on the six factors enumerated in the Tenth Circuit's [*Breakthrough*] analysis.  As a result, it is immune from suit under existing tribal immunity precedent."  *Howard*, 2017 U.S. Dist. LEXIS 137229, at *8, *approved and adopted*, 2017 U.S. Dist. LEXIS 136275.

Nothing has changed since then.  Accordingly, each of the following *Breakthrough* factors continues to support extension of the Tribe's immunity to Plain Green.

Factor 1: Method of Creation.  The first factor weighs in favor of immunity because the Tribe incorporated Plain Green under its laws and Plain Green operates pursuant to the Tribe's laws.  (Whitford Decl. ¶¶ 7, 9, 15–17; Ex. D at 1; Ex. E at 21; Ex. G); *Howard*, 2017 U.S. Dist. LEXIS 137229, at *8–9.  Additionally, in ratifying and approving Plain Green's Articles of Organization, the Tribe "recognize[d] the responsibilities of [Plain Green, LLC], as an economic arm of the Tribe" to serve the needs of the Tribe and its members.  (Ex. E at 19; Whitford Decl. ¶ 14.)  The Tribe has amended Plain Green's Articles of Organization, most

recently in 2016, (Whitford Decl. ¶ 8), and the resolutions adopting those amendments expressly reaffirm Plain Green's tribal status and its tribal public purpose.  (*Id.*; Ex. E at 1–2, 9, 18–19.)

Factor 2: Purpose.  The second factor weighs in favor of immunity because Plain Green was "created for the financial benefit of the Tribe and to enable it to engage in various government functions."  *Breakthrough*, 629 F.2d at 1192; *Howard*, 2017 U.S. Dist. LEXIS 137229, at *9–10.  The Tribe formed Plain Green for the express purposes of serving the social economic, educational, and health needs of the Tribe; increasing Tribal revenues; enhancing the Tribe's economic self-sufficiency and self-determination; and providing positive, long-term social environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects.  (Whitford Decl. ¶ 11; Ex. D at 1; Ex. E at 21.)  The fact that Plain Green's offices are located on the Reservation also evinces that the company's purpose is to benefit the Tribe.  (Whitford Decl. ¶ 10.)  As the Court in *Howard* found, "it is clear from the text of Plain Green's charter that it was created for the Tribe's financial benefit."  2017 U.S. Dist. LEXIS 1372292017, at *9.

Factor 3: Structure, Ownership, and Management.  The third factor weighs in favor of immunity because "Plain Green is owned by the Tribe."  *Id.* at *10–11.  The Chippewa Cree Tribe owns and manages Plain Green through a single manager-managed limited liability company; the company's sole member is the Tribe, which has the exclusive authority to appoint and remove the manager.  (Whitford Decl. ¶ 9; Ex. E at 11, 15, 18–19.)  Moreover, Plain Green alone runs everything about its business—"cradle to grave."  (Whitford Decl. ¶ 10.)  There are no third parties or outside individuals exercising any ownership or management control over Plain Green.  (*Id.*)  Plain Green does not utilize a third-party service provider.  (*Id.*)  It runs its own platforms and its own loan product.  (*Id.*)  It markets, underwrites, funds, and processes its

-15-

loans.  It collects all payments from its customers.  (*Id.*)  Thus, contrary to the Plaintiffs' creative allegations (*see, e.g.*, Compl. ¶ 15) the Tribe controls and is actively involved in the ownership, management, and all day-to-day operations of Plain Green.

Further, Plain Green is subject to tribal law.  Specifically, it is subject to strict regulation under the Tribe's Lending and Regulatory Code, which regulates a variety of Plain Green's activities, including the extension of credit, application of usury and interest rates, and required loan agreement disclosures, among other topics.  (*See* Whitford Decl. ¶¶ 11–12; Ex. F at Ch. 3, Parts 1, 2, and 5; Ex. G.)  In addition, tribal law subjects Plain Green to regulation by the TCPB, which is an independent governmental regulatory subdivision of the Tribe.  (*See* Ex. F at Chapter 4.)  The TCPB conducts quarterly compliance audits of Plain Green in addition to an annual on-site review.  (*See id.*, § 10-4-108, 10-4-111.)

The foregoing all demonstrate, as the *Howard* court concluded, that the "structure, ownership and management of Plain Green indicates that it functions as an economic arm of the Tribe, and thus satisfies the third factor of *Breakthrough*."  2017 U.S. Dist. LEXIS 137229, at *11.

Factor 4: Tribal Intent that Entity is Vested with Immunity.  This factor "unequivocally" weighs in favor of immunity because the Tribe clearly intended for Plain Green to share in its immunity as an arm of the Tribe.  *Howard*, 2017 U.S. Dist. LEXIS 137229, at *11. Plain Green's Articles of Organization state: "[t]he Tribe hereby confers on [Plain Green] sovereign immunity from suit to the same extent that the Tribe would have such sovereign immunity if it engaged in the activities undertaken by [Plain Green]."  (Ex. E at 22.)  The Articles further state: "The [Tribe] hereby confers on the Company all of the Tribe's right, privileges and federal immunities concerning federal, state, and local taxes, regulation, and

-16-

jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities, it if engaged in the activities undertaken by [Plain Green]." (*Id.* at 5.)  In short, the fourth factor is satisfied "by the Tribe's express intent to confer its tribal immunity onto Plain Green." *Howard*, 2017 U.S. Dist. LEXIS 137229, at *11.

Factor 5: Financial Relationship.  On this factor, Plaintiffs' factual assertions are simply wrong.  (*See* Compl. ¶¶ 4, 46.)  Since its inception and until this day, the Tribe has been the sole owner of Plain Green, (Whitford Decl, ¶¶ 7, 9; Ex. E at 21), and, as a result, "*all* of [Plain Green's] profits inure to the benefit of the Tribe."  *Howard*, 2017 U.S. Dist. LEXIS 137229, at *11 (emphasis added).  Moreover, as noted, Plain Green operates all facets of its business internally, including funding its loans and collecting all payments on its loans. (Whitford Decl. ¶ 10.)  Thus, the fifth factor is satisfied.

Factor 6: Serving the Purposes of Sovereign Immunity.  Plain Green's immunity would further federal policies intended to promote Indian tribal autonomy because Plain Green serves a critical role in the Tribe's efforts to generate revenues as a means of promoting increased economic independence and self-determination.  (*Id.* ¶ 11; Ex. D at 1; Ex. E at 21.)  As noted, revenues from Plain Green are currently funding the development of a health clinic for the Tribe.  (Whitford Decl. ¶ 14.)  Revenues are also used by the Tribe to fund Tribal community events, such as ceremonies and pow-wows, school supplies, medical equipment, and subsistence distributions to Tribal members, among other Tribal initiatives.  (*Id.*)  Indeed, Plain Green "plainly promote[s] and fund[s] the Tribe's self-determination through revenue generation and the funding of diversified economic development."  *Breakthrough*, 629 F.3d at 1195.  Without revenues from Plain Green, it would be much more difficult for the Tribe to meet the needs of its members and provide them with necessary governmental services, including law enforcement,

fire, public utility, housing, and other fundamental welfare services.  (Whitford Decl. ¶ 14.)  Indeed, "the sixth factor of *Breakthrough* is satisfied because Plain Green promotes economic development and self-sufficiency, which is a central purpose of tribal  immunity." *Howard*, 2017 U.S. Dist. LEXIS 137229, at *13 (citing *Kiowa*, 523 U.S. at 757).

Plaintiffs cannot refute what the court held in *Howard*: all six *Breakthrough* factors support extension of the Tribe's immunity to Plain Green.  2017 U.S. Dist. LEXIS 137229, at *13.  Because Plain Green is an economic arm of the Tribe that is entitled to sovereign immunity from suit, this Court has jurisdiction over Plaintiffs' claims only if Plaintiffs can prove that Plain Green's immunity was either waived or abrogated by Congress.

    c.    <u>Plain Green's Sovereign Immunity Was Not Waived or Abrogated by Congress</u>

As a matter of federal law, an Indian tribe or its economic arms are subject to suit "only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa*, 523 U.S. at 754.  A tribe's "waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo*, 436 U.S. at 59.  As part of their burden to prove subject matter jurisdiction, *SunTrust Bank*, 766 F. Supp. 2d at 688, Plaintiffs must show that the Tribe's sovereign immunity has been abrogated or waived.  *See also Amerind*, 633 F.3d at 685–86 (stating that the plaintiff "bear[s] the burden of proving that either Congress or [the Tribe] has expressly and unequivocally waived tribal sovereign immunity").

Plaintiffs present no evidence that any entity with the authority to waive Plain Green's immunity has done so with respect to Plaintiffs' claims, and that is because such evidence does not exist.  As discussed *infra* in Section III.B, Plaintiffs have a remedy against Plain Green: arbitration before a neutral arbitrator in a location of Plaintiffs' choosing.  However, Plaintiffs have chosen to file this barred suit instead of pursuing the legitimate remedies they

maintain.  Neither the Tribe nor Plain Green has executed any instrument or taken any action that could be construed as a waiver of Plain Green's immunity with respect to Plaintiffs' claims. (Windyboy Decl. ¶¶ 10–11.)

Because Plain Green has not waived its immunity, Plaintiffs must show that Congress expressly abrogated Plain Green's immunity from suit under the RICO statute.  As an initial matter, it is critical to understand that the applicability of a statute to a tribe has no bearing on whether Congress intended to abrogate tribal sovereign immunity in that same statute.  That is because "whether an Indian tribe is *subject* to a statute and whether the tribe may be *sued* for violating the statute are two entirely different questions." *Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1130 (11th Cir. 1999); *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 357 (2d Cir. 2000); *see Kiowa*, 523 U.S. at 755 ("There is a difference between the right to demand compliance with state laws and the means available to enforce them.").  Therefore, for the purposes of Plain Green's motion to dismiss for lack of subject matter jurisdiction, it is irrelevant whether RICO applies to Plain Green—which it does not, *see infra* Section III.C.2.  For present purposes, this Court need only decide whether RICO abrogates tribes' immunity through unequivocal and express language by Congress.

The answer to that question is decidedly "no."  All courts that have considered whether Congress intended to abrogate tribal sovereign immunity in RICO have answered in the negative.  *See Smith v. Babbitt*, 875 F. Supp. 1353, 1365 (D. Minn. 1995) (concluding that "RICO contains no language which suggests Congress 'unequivocally' waived Indian tribes' sovereign immunity"), *judgment aff'd, appeal dismissed in part*, 100 F.3d 556 (8th Cir. 1996); *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1047 (E.D. Wis. 1999) (concluding that there is "no basis in law or fact for concluding that Congress has authorized this

-19-

[RICO] suit" against the Sokaogon Chippewa Community, a federally recognized Indian tribe); *see also Tassone v. Foxwoods Resort Casino*, No. 11-1718, 2012 U.S. Dist. LEXIS 71882, at *3 (D. Conn. May 23, 2012) (concluding that "RICO does not contain an abrogation of the tribal immunity"), *aff'd*, 519 F. App'x 27 (2d Cir. 2013); *James Joseph Morrison Consultants, Inc. v. Sault Ste. Marie Tribe of Chippewa Indians*, No. 97-315, 1998 U.S. Dist. LEXIS 13653, at *10 (W.D. Mich. Aug. 6, 1998) (same); *Leigh v. Blackfeet Tribe of Blackfeet Indian Reservation*, No. 89-1568, 1990 U.S. Dist. LEXIS 11026, at *1 (D. Mass. Aug. 17, 1990) (rejecting a claim of abrogation of tribal sovereign immunity through RICO because "plaintiff points to nothing in the Act to support his argument that the statute is a Congressional waiver of the Tribe's immunity"). Again, that is because no such evidence exists.

Further, Virginia usury laws cannot abrogate tribal sovereign immunity. "Only Congress, and not a state legislature, can abrogate tribal immunity, because 'tribal immunity is a matter of federal law and is not subject to diminution by the States.'"[4] *Furry v. Miccosukee Tribe of Indians of Florida*, 685 F.3d 1224, 1230 (11th Cir. 2012) (quoting *Kiowa*, 523 U.S. at 756). Alternatively, if this Court determines that Plain Green is immune from Plaintiffs' claims under RICO, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3).

In sum, there has been no waiver of Plain Green's immunity with respect to Plaintiffs' claims, and Congress has not abrogated that immunity. Because Plain Green is

---

[4] Plain Green is immune from state law for its commercial, on- or off-reservation conduct. *Bay Mills*, 134 S. Ct. at 2036; *see also infra* Footnote 19 (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980)). Plaintiffs therefore cannot rely on the alleged violation of Virginia law to establish a RICO claim. (*See, e.g.*, Compl. ¶¶ 73–74 (alleging an "unlawful debt" RICO theory, which, in turn, is premised on the collection of debt at a rate twice the legally enforceable limit, 18 U.S.C. § 1961(6)).) Accordingly, Plain Green's immunity from the federal RICO claims is as strong as its immunity from Plaintiffs' state law claim.

shielded by the Tribe's sovereign immunity, this Court lacks subject matter jurisdiction to adjudicate Plaintiffs' claims against Plain Green.  As a result, the claims must be dismissed.

        B.      <u>This Matter Must be Submitted to Arbitration</u>

        If the Court does not dismiss this matter on immunity grounds, it should compel arbitration in accordance with the loan agreements between Plain Green and Plaintiffs.  The agreements mandate that any and all "disputes" be submitted to arbitration.  (Gibbs Agreement at 7.)  Here, Plaintiffs raise two issues: (1) the interest rates that applied to their loans violate state and federal law; and (2) the tribal choice of law clause and arbitration provisions are "unconscionable and unenforceable" because they combine to "disclaim all federal and state laws in favor of tribal law."  (Compl. ¶¶ 1–7, 58–85.)  Both issues fall under the broad definition of "dispute" and therefore must be decided (at least in the first instance) by an arbitrator.  (*See* Gibbs Agreement at 7.)  In these circumstances, the Court should compel arbitration and dismiss this action, because all the allegations in the Complaint must be resolved through arbitration. *See Hawthorne v. BJ's Wholesale Club*, No. 15-572, 2016 U.S. Dist. LEXIS 114969, at *19 (E.D. Va. Aug. 26, 2016) (Lauck, J.) ("The law remains unsettled as to whether a court should stay or dismiss a case when all claims are subject to arbitration, but no question exists that the Court has the discretion to take either option.") (footnote omitted).

        1.    *The Arbitration Agreement*

        The loan agreements clearly and conspicuously apprise the borrower of a "**<u>WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT</u>**."  (Gibbs Agreement at 6.)  Before detailing the arbitration provision, the agreements inform borrowers, again in bold

and capitalized font, that they have a right to opt out of arbitration, and describe in depth how a borrower exercises that opt-out option.[5]  (*Id.* at 7.)

After advising potential borrowers of their right to opt out, the arbitration provision advises borrowers to "**PLEASE CAREFULLY READ THIS AGREEMENT TO ARBITRATE**" and explains that "[u]nless you exercise your right to opt-out of arbitration in the manner described above, you agree that any dispute you have relating to this agreement will be resolved by binding arbitration."  (*Id.*)  To hammer home the point, the agreement further explains that arbitration "replaces litigation."[6]

The arbitration clause then explains what arbitration is—a "form of alternative dispute resolution where Disputes are present to an independent third party for resolution."  (*Id.*) A "Dispute" is broadly defined as "any claim or controversy of any kind between you and Plain Green or otherwise involving this Agreement or the Loan."  (*Id.*)  Critically, this term includes:

- "All federal, state, or Tribal claims or demands (whether past, present, or future), based on any legal or applicable theory and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief)"; and

- "[A]ny issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to arbitrate"[7]

---

[5] Gibbs did not opt out of arbitration, and Mwethuku did not opt out of arbitration except with respect to his loan agreement dated August 22, 2013.  (*See* Windyboy Decl. ¶ 9.)

[6] The Agreements contain a class action waiver, which Plaintiffs have violated by bringing this class action lawsuit.  Plain Green reserves the right to enforce the class action waiver in any court or arbitration. *See, e.g., Am. Express Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2309 (2013) (upholding class action waiver and instructing courts to "rigorously enforce arbitration agreements according to their terms") (internal quotation marks omitted).

[7] As discussed *infra* in Section III.B.1, this provision is known as a "delegation clause" and is consistent with the Supreme Court's determination that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or

Pursuant to the agreements, the Plaintiffs may elect to arbitrate any dispute before two reputable, industry-leading arbitration organizations: the American Arbitration Association or JAMS.[8]  (*Id.*)  Plaintiffs also select where the arbitration takes place, either within thirty miles of their homes or on the Tribe's Reservation.  (*Id.*)  In addition to the significant convenience of choosing the arbitration firm and location, the arbitration provision charges Plain Green with "pay[ing] the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the arbitration."  (*Id.*)

The loan agreements also include a choice of law clause calling for the application of tribal law.  (*Id.* at 1–2.)  Under Chippewa Cree law, if substantive tribal law is insufficiently developed to resolve Plaintiffs' contentions, that law can be supplemented with the state law of Montana and with federal law.  *See Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1400 n.2 (S.D. Fla. 2014) ("Under Chippewa Cree tribal law, the Court 'may apply laws and regulations of the United States or the State of Montana.'") (quoting Law and Order Code of the Chippewa Cree Tribe § 1.9 (1987)).

2. *Every Issue in this Litigation Must be Submitted to Arbitration*

The Court should defer to the parties' binding arbitration clause, which mandates arbitration of Plaintiffs' action.  The Federal Arbitration Act ("FAA") reflects the "liberal federal policy favoring arbitration agreements."  *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273 (4th Cir. 1997) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and

---

whether their agreement covers a particular controversy."  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

[8] The arbitration takes place in accordance with the AAA or JAMS "policies and procedures . . . applicable to consumer disputes," provided there is no conflict with the loan agreements or tribal law.  (Gibbs Agreement at 7.)

enforceable." 9 U.S.C. § 2. Indeed, the "central or primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen S. A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks and citation omitted); *see also Rent-A-Center*, 561 U.S. at 67 (courts must place arbitration agreements "on equal footing with other contracts and . . . enforce them according to their terms"). Accordingly, "[o]nce a court determines that the parties entered into a written agreement to arbitrate the underlying dispute, Section 4 directs courts to compel arbitration if necessary. . . . The FAA gives district courts no discretion to do otherwise." *Hawthorne*, 2016 U.S. Dist. LEXIS 114969, at *9–10.

The instant arbitration agreement requires every issue in this case to be submitted to arbitration, at least in the first instance.[9] Plaintiffs raise two issues: (1) the interest rates that applied to their loans violate state and federal law; and (2) the tribal choice of law clause and arbitration provisions are "unconscionable and unenforceable" because they combine to "disclaim all federal and state laws in favor of tribal law." (Compl. ¶¶ 1–7, 58–85.)

Both issues fall squarely within the arbitration agreement's broad definition of a "dispute." The first issue—claims under federal and state law and related requests for monetary, equitable, and declaratory relief—is undoubtedly captured in the meaning of dispute as "all federal, state, or Tribal claims or demands (whether past, present, or future), based on any legal or applicable theory and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief)." (Gibbs Agreement at 7.) Similarly, the second issue—whether the

---

[9] The arbitration agreement and FAA provide avenues for review upon conclusion of the arbitration proceedings. (*See* Gibbs Agreement at 8 (providing for tribal court review of arbitration awards)); *see also* 9 U.S.C. §§ 9, 10 (providing for federal court review of arbitration awards in certain circumstances).

arbitration and choice of law clauses are enforceable—"concern[s] the validity, enforceability, or scope of this Agreement or this Agreement to arbitrate." (*Id.*)

This analysis is not affected by Plaintiffs' allegation that the agreement, when read in combination with the tribal choice of law clause, is "unenforceable and unconscionable" because it purportedly displaces federal and state law.  Pursuant to the agreements' delegation clause, the parties agreed that the arbitrator must decide the validity of the arbitration agreement. *See supra* Footnote 7.  The Supreme Court in *Rent-A-Center* held that such delegation clauses are enforceable if there is "clear and unmistakable" evidence that the parties intended for the arbitrator to address these issues.  *See* 561 U.S. at 69 n.1; *see also Carson v. Giant Food, Inc.*, 175 F.3d 325, 330 (4th Cir. 1999) (stating similarly that "if contracting parties wish to let an arbitrator determine the scope of his own jurisdiction, they must indicate that intent in a clear and specific manner.").

The "clear and unmistakable" standard is met here.  The instant delegation clause calls for the arbitrator to resolve any and all "disputes," which include "the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate."  The delegation clause enforced by the Supreme Court in *Rent-A-Center* similarly provided that the arbitrator had the authority to "resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." 561 U.S. at 66 & 69 n.1.  Courts in this circuit and others agree. *See Meena Enters. v. Mail Boxes Etc., Inc.*, No. 12-1360, 2012 U.S. Dist. LEXIS 146406, at *16 (D. Md. Oct. 11, 2012) ("clear and unmistakable" standard met where delegation provision stated that "*the validity, scope, and enforceability of this Section*, shall be *solely and finally settled by binding arbitration*"); *Thornton v. First Nat'l Bank Credit Card*, No. 12-0492, 2012

U.S. Dist. LEXIS 136049, at *9 (S.D. W. Va. Sep. 24, 2012) (same, where language of delegation clause was nearly identical to the Gibbs Agreement); *Banks v. CashCall, Inc.*, 188 F. Supp. 3d 1296, 1302 (M.D. Fla. 2016) (same); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1148 (11th Cir. 2015) (same, holding that this language "unambiguously commits to the arbitrator the power to determine the enforceability of the agreement to arbitrate").[10]

In sum, because the language of the instant delegation clause meets the "clear and unmistakable" evidence standard, this Court must defer to the arbitrator the gateway question regarding the enforceability of the arbitration agreement.[11]

---

[10] *Contrast Peabody Holding Co., LLC v. UMW*, 665 F.3d 96, 103 (4th Cir. 2012) ("clear and unmistakable" standard not met where the agreement providing generally for arbitration of "[a]ny dispute alleging a breach of this [Jobs Agreement]"); *Carson.*, 175 F.3d at 330 (same where the clause provided generally that an arbitrator had authority to resolve "all interpretive disputes 'relating to' or 'arising out of' the agreement").

[11] The Fourth Circuit recently reached the opposite conclusion in *Hayes* and *Dillon*. In both cases, the arbitration agreement delegated to the arbitrator "any issue concerning the validity, enforceability, or scope" of the loan or arbitration agreements. Both cases are distinguishable from the instant matter, however.

The *Hayes* court seized on the rule from *Rent-A-Center* that federal court review is appropriate if the plaintiff "challenge[s] the delegation provision *specifically.*" 561 U.S. at 72 (emphasis added). The court held that because plaintiffs "have challenged the validity of [the] delegation clause with sufficient force and specialty to occasion our review," it was proper for the district court to consider the threshold issue of arbitrability. 811 F.3d at 671 n.1 (citing *Rent-A-Center*, 561 U.S. at 71–72). Plaintiffs have not done so here. Instead, they have challenged the arbitration agreement insofar as it allegedly combines with the choice of law clause to prevent Plaintiffs from bringing their federal and state law claims. (Compl. ¶¶ 7, 76–85); *see Thornton*, 2012 U.S. Dist. LEXIS 136049, at *9 (upholding delegation clause because "[a]s in *Rent-A-Center*, Plaintiffs do not make any specific arguments in her Response that the delegation provision itself is unenforceable."); *Parnell*, 804 F.3d at 1148 (same, because, like here, "at no point in his complaint does [the plaintiff] specifically challenge the parties' agreement to *commit to arbitration* the question of the enforceability of the arbitration agreement"). Accordingly, *Hayes* does not require this Court to take on the "gateway" questions that the parties delegated to the arbitrator.

The *Dillon* court, meanwhile, did not address this critical issue of whether the parties delegated to the arbitrator questions regarding the validity of the agreement. In light of the

-26-

The *Dillon* court also articulated another reason why Plaintiffs' unenforceability allegation must be submitted to the arbitrator. Plaintiffs allege that the arbitration and choice of law clauses combine to result in a prospective waiver of their right to bring federal and state law claims against Plain Green. As the *Dillon* court noted, under the prospective waiver doctrine, "[w]hen there is uncertainty" as to that question, "*the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies*." 856 F.3d at 333 (emphasis added). Depending on the arbitrator's decision, Plaintiffs would then have the opportunity to raise this issue before the tribal court or federal court. *See* (Gibbs Agreement at 8 (providing for tribal court review of arbitration awards)); 9 U.S.C. §§ 9–10 (providing for federal court review of arbitration awards in certain circumstances). For the reasons discussed *infra* in Section III.B.3, it is clear that the tribal choice of law clause does not displace federal law. But at the very least, there is enough "uncertainty" as to warrant the arbitrator to consider this issue in the first instance, as the parties intended. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 373 (4th Cir. 2012) (prospective waiver doctrine challenges are not addressed "until the second stage of the arbitration court proceedings—the award enforcement stage").

In these circumstances, the Court should enforce the parties' binding arbitration clause, which requires all the allegations raised in the Complaint to be submitted in the first instance to a neutral arbitrator—not this Court.

### 3.    *The Arbitration Agreement is Valid and Enforceable*

The language of the arbitration agreement provides "clear and unmistakable" evidence that the parties intended for the arbitrator to determine whether the arbitration

---

strong federal policy of enforcing arbitration clauses as written, this Court should both consider the issue and decide it in Plain Green's favor.

agreement is, as Plaintiffs allege, "unconscionable and unenforceable." *See supra* Section III.B.2. However, even if the Court undertakes this inquiry, it should uphold the agreement.[12]

Plaintiffs do not allege that the agreement is substantively or procedurally unfair. Nor could they. The arbitration agreement affords Plaintiffs the right to pick the arbitration firm and location and charges Plain Green with the responsibility to pay for filing costs. *See Stewart v. Legal Helpers Debt Resolution, LLC*, No. 11-26, 2012 U.S. Dist. LEXIS 76168, at *18–20 (W.D.N.C. June 1, 2012) (arbitration agreement between consumer and debt negotiation company fair where it allowed the filing party to pick the arbitrator and provided that arbitration would take place in either "the Plaintiff's county of residence or the closest metropolitan county"); *Johnson v. Ace Cash Express, Inc.*, No. 13-1186, 2014 U.S. Dist. LEXIS 100857, at *15 (D. Del. July 24, 2014) (arbitration clause in loan agreement fair because, *inter alia*, the clause allowed the borrower to choose the arbitrator, request payment of arbitration fees, and arbitrate in a "convenient" location). Moreover, the agreement offers Plaintiffs the opportunity

---

[12] In conducting this inquiry, the Court should apply Chippewa Cree law. (*See* Gibbs Agreement at 1 (the loan is "made within the tribe's jurisdiction and is subject to and governed by tribal law").) Tribal law provides that:

> a. A Loan Agreement may not contain a mandatory arbitration clause that is oppressive, unconscionable, unfair, or in substantial derogation of a Consumer's rights.

> b. A mandatory arbitration clause that complies with the applicable standards of the American Arbitration Association must be presumed to not violate the provisions of § 10-3-602 (a).

Chippewa Cree Tribal Code, Section 10-3-602, a true and correct copy of which is attached as Exhibit F to the Whitford Declaration. To the extent that additional authority is needed, the Court may supplement tribal law with the Montana law and federal law. *See Gunson*, 43 F. Supp. 3d at 1400 n.2. But in any event, the arbitration agreement is enforceable under both tribal and Virginia law.

to opt out of arbitration, another hallmark of reasonableness.  *See Hawthorne*, 2016 U.S. Dist. LEXIS 114969, at *15–16.

Plaintiffs' only objection is that the arbitration agreement, when read together with the tribal choice of law clause, is unenforceable and unconscionable because it purportedly displaces federal and state law.[13]  As an initial matter, the agreement does not prevent Plaintiffs from bringing their federal and state law claims in arbitration.  In fact, the agreement specifically anticipates that borrowers will make "claims or demands" under "federal [and] state" law for "money, injunctive relief, or declaratory relief."  The agreement simply calls for these claims to be submitted to arbitration.  *See Italian Colors Rest.*, 133 S. Ct. at 2310 (arbitration agreement enforceable so long as it does not result in a "prospective waiver of a party's *right to pursue* statutory remedies") (emphasis added).

The arbitration and choice of law clauses also withstand scrutiny under *Hayes* and *Dillon*.  In these cases, the Fourth Circuit refused to compel arbitration in favor of a non-Indian debt collector solely on the ground that the arbitration agreement "purport[ed] to renounce wholesale the application of any federal law to the plaintiffs' federal claims."  811 F.3d at 673 (commenting that the court's decision was based on the "present agreement's outright rejection of the application of federal law"); *see also Dillon*, 856 F.3d at 335 (declining to compel arbitration because "we conclude that the arbitration agreement functions as a prospective waiver of federal statutory rights and, therefore, is unenforceable as a matter of law").  There is no express disclaimer of federal law in the instant provision, thus rendering *Hayes* and *Dillon* inapplicable.

---

[13]  Although Plain Green will address the merits of Plaintiffs' prospective waiver argument here, it preserves its position that this argument must be decided in the first instance by the arbitrator.  *See supra* Section III.B.2.

The arbitration agreement does contain an express disclaimer of state law, in favor of tribal law.  (Gibbs Agreement at 1–2.)  This is entirely consistent with the purpose of choice of law clauses—i.e., to dictate which law applies and which laws do not.  Courts uphold these clause as a matter of course under both the FAA and Virginia law.[14]  *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances."); *Zaklit v. Glob. Linguist Sols., LLC*, No. 14-314, 2014 U.S. Dist. LEXIS 92623, at *29 (E.D. Va. July 8, 2014) (Virginia law permits choice of law clauses to govern non-contract claims; "[t]he rationale underlying this rule is straight forward; allowing parties to negotiate the rules that govern their relationship creates certainty and avoids applying the laws of multiple jurisdictions to a controversy having its origin in a single, contract-based relationship"); *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("[T]he FAA lets parties tailor some, even many, features of arbitration by contract, including the way arbitrators are chosen, what their qualifications should be, which issues are arbitrable, along with procedure and choice of substantive law.").  A contract provision calling for the application of tribal law—to the exclusion of Virginia law—is no different than a contract calling for the application of Utah law—to the exclusion of Virginia law.  *See Settlement Funding*, 645 S.E.2d at 438 (Virginia usury law inapplicable in light of the parties' Utah choice of law clause).

In sum, the Court should uphold the arbitration agreement because it is procedurally and substantively fair under both tribal and Virginia law and, contrary to Plaintiffs'

---

[14]  The agreement's express disclaimer of state law is not problematic under the prospective waiver doctrine because that doctrine applies only where an arbitration agreement results in a waiver of *federal* rights, not state rights.  *See Hayes*, 811 F.3d at 674–76; *Dillon*, 856 F.3d at 335.

allegations, affords them the "right to pursue" the federal and state law claims raised in the Complaint. *Italian Colors Rest.*, 133 S. Ct. at 2310.

4. *If the Court Determines that Any Provision is Unenforceable, that Provision Must be Severed and the Remainder of the Agreement Must Be Enforced*

The loan agreement contains a severability clause, which provides that if "any provision of this Agreement is held unenforceable, including any provision of the Waiver of Jury Trial and Arbitration Agreement, the remainder of this Agreement shall remain in full force and effect." (Gibbs Agreement at 6.) Plaintiffs' only dispute with the arbitration agreement is that, when read in combination with the choice of law clause, it purportedly operates to disclaim federal and state law. (Compl. ¶¶ 76–85.) Plaintiffs do not—nor could they—challenge other provisions of the arbitration agreement, such as the arbitration forum (AAA or JAMS), the arbitration location (within 30 miles of the Plaintiffs' residence or on the Tribe's reservation), or any other aspects of the arbitration.

As discussed *supra* in Sections III.B.2–3, Plaintiffs' "disclaimer" argument should be resolved in the first instance by the arbitrator or, alternatively, resolved by this Court in Plain Green's favor. However, if the Court were to conclude that the choice of law clause or any other provision of the agreement was unenforceable, it should sever the offending provision and enforce the remainder of the agreement by compelling arbitration. *See Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 682 (8th Cir. 2001) (if courts "were to hold entire arbitration agreements unenforceable every time a particular term is held invalid, it would discourage parties from forming contracts under the FAA and severely chill parties from structuring their contracts in the most efficient manner for fear that minor terms eventually could be used to undermine the validity of the entire contract").

C.     Additional Bases for Dismissal

As is apparent from Plaintiffs' loan agreements, this lawsuit cannot proceed as a matter of law in this Court due to Plain Green's sovereign immunity from suit and the agreements' mandatory arbitration provisions.  But these are not the only reasons that Plaintiffs' claims must be dismissed.  Plaintiffs have also failed to demonstrate that venue in this Court is proper and to meet the pleading standards set forth by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  For these additional reasons, the Court should dismiss this case with prejudice.

1.     *This Case Should be Dismissed Because Venue in this District is Not Proper*

Under Federal Rule of Civil Procedure 12(b)(3), Plaintiffs must demonstrate that venue in this district is proper.  Their conclusory recitation of the Rule 12(b)(3) standard and allegations that some (but not all) Plaintiffs live in this district are insufficient.  (Compl. ¶¶ 9, 10–14.)  In the Fourth Circuit, venue inquiries under 28 U.S.C. § 1391(b)(2) focus on where the *Defendants'* acts took place, not where a plaintiff may have felt harm.  *See Massi v. Lomonaco*, No. 10-265, 2010 U.S. Dist. LEXIS 58103, at *4 (D.S.C. May 25, 2010) ("Most courts have found that the suffering of economic harm within a district is not sufficient without more to warrant transactional venue in that district. This is probably the correct view, because otherwise venue almost always would be proper at the place of the plaintiff's residence . . . .") (quoting Wright, Miller & Cooper, *Federal Practice & Procedure* § 3806.1); *Verizon Online Servs. v. Ralsky*, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002) (underscoring that the location of "Defendants' actions" guide the venue inquiry).

Here, venue plainly does not lie in the Eastern District of Virginia.   The Complaint fails to establish that Plain Green affirmatively did anything in this district.  While the Complaint arises out of loan agreements that Plaintiffs entered into with Plain Green, these

agreements were formed on the Chippewa Cree Tribe's Reservation—not in Virginia. *See* (Windyboy Decl. ¶ 6); Restatement (Second) of Conflict of Laws, § 188 cmt. e (1971) (noting that the "place of contracting is the place where occurred the last act necessary . . . to give the contract binding effect"); 2 Williston on Contracts § 6:62 (4th ed.) ("[T]he place of the contract is the place where the last act necessary to the completion of the contract was done."). Accordingly, this district is not the site of "a substantial part of the events" underlying Plaintiffs' action, warranting dismissal of this action. Fed. R. Civ. P. 12(b)(3).[15]

2.   *This Case Must be Dismissed For Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6)*

a.   <u>Plaintiffs' Claims Must Be Dismissed as a Matter of Law in Light of the Virginia Supreme Court's Decision in *Settlement Funding*</u>

Plaintiffs' claims rest on the assumption that the interest rates that applied to the loans exceeded Virginia law. *See* Va. Code § 6.2-305(A) (maximum interest rate under Virginia law is 12 percent); 18 U.S.C. § 1961(6) (providing a cause of action under RICO for the collection of "unlawful debt"—i.e., money lent at twice the applicable enforcement rate). But Virginia law does not apply to the loans. Under the clear and conspicuous choice of law clause

---

[15] If the Court declines to enforce the binding arbitration agreement contained in the loan agreements, the Defendants move the Court to enforce the agreements' forum selection clause and dismiss this case on the basis of *forum non conveniens*. Here, the parties expressly designated the Chippewa Cree Tribal Court as the appropriate forum for any in-court dispute resolution. (*See* Gibbs Agreement at 6–7.) There is a "strong federal policy . . . favoring the enforcement of valid forum-selection clauses." *SFL+A Architects, PA v. Marlboro Cty. Sch. Dist.*, No. 13-03071, 2014 U.S. Dist. LEXIS 119905, at *11 (D.S.C. Aug. 28, 2014) (citing *Atl. Marine Constr. Co. v. United States District Ct.*, 134 S. Ct. 568, 583 (2013). Moreover, the Tribe has a longstanding right to adjudicate civil disputes pursuant to the laws it has established for itself and it is well established that in doing so, it may exercise jurisdiction over non-members, as would be the case here. *See, e.g.*, *Montana v. United States*, 450 U.S. 544 (1981); *Williams v. Lee*, 358 U.S. 217 (1959) (recognizing that tribal jurisdiction extended to a non-member based on an on-reservation transaction).

-33-

on the first page of the loan agreements, Plaintiffs agreed to the application of tribal law, which does not have a maximum interest rate.[16]

Because the interest rates comport with tribal law, Plaintiffs cannot state a claim under the Virginia usury statute, under RICO, for unjust enrichment, or for declaratory relief. This pleading defect cannot be remedied, because the tribal choice of law clause will always displace Virginia law.  Accordingly, dismissal on this ground must be with prejudice.

*The Choice of Law Clause*

This clause provides:

> THE BORROWER EXPRESSLY CONSENTS AND AGREES THAT THIS LOAN IS MADE WITHIN THE TRIBE'S JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW AND NOT THE LAW OF BORROWER'S RESIDENT STATE.

(Gibbs Agreement at 1.)  The agreement further cautioned that if the borrower wanted the protections of his or her home state law, the borrower should consider securing a loan elsewhere:

> THE BORROWER'S RESIDENT STATE MAY HAVE INTEREST RATE LIMITS AND OTHER CONSUMER PROTECTION PROVISIONS THAT ARE MORE FAVORABLE TO THE BORROWER.  IF THE BORROWER WISHES TO HAVE THE BORROWER'S RESIDENT STATE'S LAW APPLY TO ANY LOAN THAT THE BORROWER OBTAINS, THE BORROWER SHOULD CONSIDER OBTAINING A LOAN FROM A LICENSED LENDER IN THE BORROWER'S STATE.

(*Id.* at 1–2.)

---

[16] *See* Chippewa Cree Tribal Code, Section 10-3-201 (Whitford Decl., Ex. F) ("Unless a maximum Interest rate or charge is specifically established elsewhere in this Title or the other laws of the Tribe, there is no maximum Interest rate or charge, or usury rate restriction between or among Persons if they establish the Interest rate or charge by written agreement.  The Creditor and the Consumer can agree upon what fees and charges may be assessed as set forth in any written agreement between the Creditor and the Consumer.").

Plaintiffs did not do this (except with respect to one loan agreement[17]).  Instead, they agreed to be bound by the instant choice of law provision.  Before executing the loan agreement, Plaintiffs were required to check a box acknowledging that they "agree that this Loan is governed by the laws of the Chippewa Cree Tribe and is not subject to the provisions or protections of the laws of your home state or any other state."  (*Id.* at 8.)

*Virginia Courts Routinely Uphold Choice of Law Clauses*[18]

Virginia law is clear: "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied."  *Settlement Funding,* 645 S.E.2d at 438.  As recognized by the Fourth Circuit, "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances."  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999).

This is true where the choice of law clause dictates which states' usury law applies.  In *Settlement Funding*, a consumer entered into an installment loan agreement, which contained a choice of law clause calling for the application of Utah law to "all disputes."  645 S.E.2d at 437.  The consumer defaulted on the loan, claiming that she was unaware of the interest rate that applied.  *Id.*  The trial court declined to apply Utah law because the lender had not provided sufficient proof of Utah law.  *Id.*  The court instead applied Virginia law and held that the loan violated the commonwealth's 12 percent interest rate maximum.  *Id.*

---

[17] Mwethuku opted out of arbitration in connection with the loan agreement dated August 22, 2013.  Windyboy Decl. ¶ 9.  Because Mwethuku was not bound by the arbitration agreement with respect to that loan, he does not have standing to challenge the agreement as "unenforceable" and "unconscionable."

[18] The validity of the choice of law clause should be determined by tribal law.  But even if Virginia law applies, the clause is still valid for the reasons described in this Section.

The Supreme Court reversed.  Its analysis was straightforward: (1) does the contract have a choice of law clause?; (2) if so, what does the law designated by the choice of law clause say?  After confirming that the plain text of the loan agreement called for the application Utah law, the Court addressed whether the lender presented the trial court with "sufficient information regarding the substance of Utah law." *Id.* at 439.  The Supreme Court held the lender's various court filings, which contained citations to the applicable Utah statutes, was sufficient.  Accordingly, the *Settlement Funding* court held that the trial court "erred in refusing to apply Utah law in the construction of the loan agreement" and reversed the lower court's finding that the lender violated Virginia usury law. *Id.*

Here, the loan agreement plainly calls for the application of law of the Chippewa Cree Tribe.  Like Utah law, the Tribe's law provides that:

> [T]here is no maximum Interest rate or charge, or usury rate restriction between or among Persons if they establish the Interest rate or charge by written agreement. The Creditor and the Consumer can agree upon what fees and charges may be assessed as set forth in any written agreement between the Creditor and the Consumer."

Chippewa Cree Tribal Code, Section 10-3-201 (Whitford Decl., Ex. F).  In these circumstances, this Court must apply tribal law to the loan agreements.[19]

---

[19] Further, Virginia and other state usury laws cannot be enforced against Plain Green because doing so would amount to an improper state regulation of on-reservation activity in contravention of well-established preemption and infringement principles. *Bracker*, 448 U.S. at 136; *Williams*, 358 U.S. 217.  Here, Plaintiffs' action arises out of their loan Agreements, all of which were formed on the Tribe's Reservation. It is hornbook law that the "place of contracting is the place where occurred the last act necessary . . . to give the contract binding effect."  In signing their Agreements, the Plaintiffs acknowledged that their loans formed on the Reservation, as Plain Green "do[es] not have a presence in Montana or any other state of the United States of America."  (*See* Gibbs Agreement at 8); *cf. Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 312 (1978) (rejecting the argument that the location of the bank should depend on the location of the borrower in considering whether a national bank could charge its out-of-state customers an interest rate permitted by the bank's home state, but higher than that sanctioned by the borrowers' state, for "[i]f the location of the bank were to depend on

This is fatal to all Plaintiffs' claims:

- Under *Settlement Funding*, Virginia law does not apply to the loans, thus barring a claim for relief under the commonwealth's usury statute;

- Because the interest rates are consistent with tribal law, Plaintiffs cannot plausibly allege the existence of an "unlawful debt"—i.e., money lent at twice the applicable enforcement rate—requiring dismissal of their RICO claims, *see* 18 U.S.C. § 1961(6);

- Because the choice of law provision is enforceable, Plaintiffs have no basis for declaratory relief; and

- Because the interest rate charged was permissible under the loan agreements, there can be no claim for unjust enrichment, *see Jones v. Bank of Am. Corp.*, No. 09-162, 2010 U.S. Dist. LEXIS 142918, at *21–23 (E.D. Va. Aug. 24, 2010) (no unjust enrichment claim where there is an

---

the whereabouts of each . . . transaction, the meaning of the term 'located' would be so stretched as to throw into confusion the complex system of modern interstate banking," noting that the Minnesota borrowers "were always free to visit Nebraska and receive loans in that State," and ultimately finding the bank to be "located" in Nebraska, where it makes its credit and finance charge assessments, such that Nebraska's usury law should govern).  Thus, application of the state usury laws to this on-reservation matter would be an affront to the "tradition of Indian sovereignty over the reservation" that is "reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development."  *See Bracker*, 448 U.S. at 143.

In a similar vein, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982)). Relevant here, "if the transaction is consummated out of state, a state may not regulate it without violating the dormant Commerce Clause." *Id.* at 483. Accordingly, application of Virginia usury laws to this matter—which arises from purely on-reservation conduct—would contravene long-established preemption / infringement principles and violate the Commerce Clause.

"express contract that covers the matter at issue" and, in any event, where the defendant did not retain a benefit without paying for its value).

Plaintiffs cannot remedy this pleading defect.  Accordingly, the Court must dismiss this action with prejudice.

### b.  Additional Pleading Deficiencies with Plaintiffs' RICO Claims

As discussed *supra* in Section III.A.2, Plain Green is immune from liability under RICO because it is a sovereign arm of the Chippewa Cree Tribe.  For many the same reasons, the RICO statute does not even apply to Plain Green in the first place.

The RICO statute applies only to "person[s]."  18 U.S.C. § 1962(a), (c).  A "person," in turn, is defined as "any individual or entity capable of holding a legal or beneficial interest in property."  *Id.* § 1961(3).  There is a "longstanding interpretive presumption that 'person' does not include the sovereign."  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) (finding that the term "person" in the False Claims Act does not include states); *cf. Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 709 (2003) (assuming that a tribe, like a state, is not a "person" that could be sued under 42 U.S.C. § 1983).  Plain Green—a sovereign arm of the Tribe—similarly is insulated from the statute's reach.  *See Stoner v. Santa Clara Cnty. Office of Ed.*, 502 F.3d 1116, 1122 (9th Cir. 2007) (construing "person" under the False Claims Act in a way that "avoids suits against 'state instrumentalities' that are effectively arms of the state immune from suit"); *see also Howard ex rel. United States v. Shosone-Paiute Tribes of the Duck Valley Indian Reservation*, No. 13-16118, 2015 U.S. App. LEXIS 10040, at *2 (9th Cir. June 15, 2015) (explaining that "the Tribe, like a state, is a sovereign that does not fall within the definition of a 'person' under the [False Claims Act]").  Accordingly, the RICO statute is wholly inapplicable to Plain Green by virtue of its sovereign status.

## IV.    Conclusion

For the foregoing reasons, Plain Green respectfully urges this Court should dismiss Complaint with prejudice or, in the alternative, to compel arbitration.

Dated:  September 19, 2017

/s/ Richard J. Zack
Richard J. Zack (*admitted pro hac vice*)
Francis A. Weber (*admitted pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750
Email: zackr@pepperlaw.com
weberf@pepperlaw.com

and

/s/ Matthew D. Foster
Matthew D. Foster (VSB 72130)
PEPPER HAMILTON LLP
600 14th Street, NW, Suite 600
Washington, DC  20005
Telephone:  (202) 220-1200
Facsimile:  (202) 220-1665
fosterm@pepperlaw.com

and

/s/ Joseph F. Halloran
Joseph F. Halloran (*admitted pro hac vice*)
Jeffrey K. Holth (*admitted pro hac vice*)
Jacobson, Magnuson, Anderson & Halloran P.C.
180 East 5th Street
Suite 940
St. Paul, MN 55101
Email : jhalloran@thejacobsonlawgroup.com
jholth@thejacobsonlawgroup.com

*ATTORNEYS FOR DEFENDANT PLAIN
GREEN, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of September, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all parties of record.

By: ____/s/ Matthew Foster_____
Matthew D. Foster (VSB 72130)
PEPPER HAMILTON LLP
600 14th Street, NW, Suite 600
Washington, DC  20005
Telephone:  (202) 220-1200
Facsimile:  (202) 220-1665
fosterm@pepperlaw.com

*Counsel for Defendant Plain Green, LLC*