# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DARLENE GIBBS, *et al.*,            )
                                    )
    Plaintiffs,            )
                                    )
v.                                  )            Civil Action No. 3:17-cv-495-MHL
                                    )
PLAIN GREEN, LLC, *et al.*,         )
                                    )
    Defendants.            )

## GREAT PLAINS LENDING, LLC'S
## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Specially-Appearing Defendant Great Plains Lending, LLC ("Great Plains"), by counsel, and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectfully submits this Memorandum in Support of its Motion to Dismiss Plaintiffs' Complaint.[1]

Great Plains is a wholly owned and operated entity of the Otoe–Missouria Tribe of Indians ("Tribe"), a federally recognized Indian tribe. This Court lacks subject matter jurisdiction over this action due to Great Plains' status as an arm of the Tribe, vested with sovereign immunity from suit. Because Great Plains' immunity has not been expressly waived by the Tribe or abrogated by Congress, this Court lacks subject matter jurisdiction to proceed in this action and Plaintiffs' Complaint should be dismissed, with prejudice, pursuant to Federal

---

[1] Great Plains files this Motion for the limited purpose of contesting this tribunal's jurisdiction to preside over the proceedings at hand. Such limited or special appearance shall not be construed as waiving any arguments that Great Plains has with regard to its sovereign immunity or this tribunal's lack of jurisdiction. Indeed, courts have routinely recognized that a sovereign's limited appearance in legal proceedings for the purpose of seeking dismissal for lack of jurisdiction does not waive any claims to sovereign immunity. *See e.g., Kansas v. United States*, 249 F.3d 1213, 1220 (10th Cir. 2001); *Zych v. Wrecked and Abandoned Vessel*, 960 F.2d 665, 667-68 (7th Cir. 1992); *Lac Du Flambeau Band of Lake Superior Chippewa Indians, et al. v. Norton*, 327 F.Supp. 2d 995, 1000 (W.D. Wis. 2004); *Wyandotte v. Kansas City*, 200 F.Supp. 2d 1279, 1287 (D. Kan. 2002); *Miami Tribe of Okla. v. Walden*, 206 F.R.D. 238 (S.D. Ill. 2001).

Rule of Civil Procedure 12(b)(1). Moreover, because the Plaintiffs have failed to properly plead a claim upon which this Court can afford relief, dismissal of Plaintiffs' Complaint is necessary and appropriate under Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

The Otoe–Missouria Tribe of Indians ("Tribe") is a federally recognized Indian tribe located in rural Oklahoma. *See* 81 Fed. Reg. 26826, 26829 (May 4, 2016). Having existed in this continent and governed itself since time immemorial, the Tribe continues to exercise the panoply of sovereign rights that all governments enjoy, including the right to develop its economy to improve the health and welfare of its citizens. Plaintiffs, a group of Virginia consumers, have a fundamental disagreement with the manner in which the Tribe has exercised this right. They have brought this putative class action against one of the Tribe's wholly owned and operated business entities, Great Plains Lending, LLC, in an attempt to put an end to the Tribe's latest effort at economic development—e-commerce in the form of consumer finance.

At its core, Plaintiffs' case centers mainly on their view of Virginia's "longstanding public policy." But even if their policy arguments had any merit—which they do not—this Court would be unable to adjudicate Plaintiffs' claims, as it lacks subject matter jurisdiction to do so. Subject matter jurisdiction is lacking for one critical reason—Great Plains is an arm of the Tribe, and thus shares in the Tribe's sovereign immunity against unconsented suit. This immunity has not been waived by the Tribe nor abrogated by Congress. Accordingly, the Court should dismiss this case with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1).

Notwithstanding the lack of jurisdiction, which is fatal, Plaintiffs' Complaint suffers from numerous other defects. In an attempt to paint Great Plains' operations as illegal and a "criminal enterprise," Plaintiffs resort to name-calling, reference to purported dealings and irrelevant court

proceedings to which Great Plains and the Tribe are not named parties, and citations to law review articles and a *Huffington Post* publication to support their attenuated claims set forth in the Complaint. Unfortunately for the Plaintiffs, such tactics are insufficient to meet muster under Federal Rule of Civil Procedure 12(b)(6). Glaringly absent from Plaintiffs' Complaint is a demonstration that the loans at issue are "unlawful" under the Racketeer Influenced and Corrupt Organizations Act. Plaintiffs have not and cannot properly seek relief under such claim(s) for the simple fact that alleged loans at issue are legal under the terms of the agreements to which the Plaintiffs expressly agreed. Moreover, such choice of law provisions have been upheld pursuant to Virginia case law, refuting attempts made by the Plaintiffs to distract this Court with unfounded allegations and mischaracterize the nature of Great Plains' business operations. Because Plaintiffs' Complaint fails to state a viable claim against Great Plains, Plaintiffs' Complaint must be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(6).

## FACTS AND BACKGROUND INFORMATION

### A.      The Otoe–Missouria Tribe

The Otoe–Missouria Tribe, as a sovereign nation, has existed and governed itself in this continent since time immemorial. It is the federally recognized tribal government of the descendants of the Otoe and Missouria people. By way of historical background, both the Otoe and Missouria originally lived in the Great Lakes region, but by 1804 had migrated to the region along the Missouri River bordering Missouri and Nebraska. There, just after the turn of the nineteenth century, both tribes participated in the first formal meeting between representatives of the United States and western Indian tribes. By the time the United States signed the first of many treaties stripping the tribes of their land in 1830, the Otoe and Missouria tribes had combined. In 1854, a treaty established a reservation for the Otoe–Missouria Tribe on the

Kansas–Nebraska border. By 1881, however, Congress had sold all of the Tribe's reservation land, forcing the Tribe to relocate to its present day location in northern Oklahoma, a state in which the majority of Otoe–Missouria members still live.

As with other sovereigns, the Tribe has governed itself according to internal regulations and norms since its inception. Its Constitution, ratified by the Tribe on February 4, 1983, and approved by the Secretary of the Interior on October 6, 1983, establishes the formal structure pursuant to which the Tribe manages its affairs. Ex. A, Constitution of the Otoe-Missouria Tribe. The Tribe's Constitution designates the seven-member Tribal Council as the governing body of the Tribe, vesting it with "final authority to transact business and otherwise speak or act on behalf of the Tribe." *Id.* at Art. VI; Art. III, § 1. This includes, *inter alia*, "the power to enact ordinances and adopt regulations to administer governmental functions of the Tribe." *Id.* at Art. VIII, § 1.

## B.    *The Tribe's Wholly Owned E-Commerce Business*

In an exercise of its lawmaking power, the Tribal Council enacted the Otoe–Missouria Tribe of Indians Limited Liability Company Act ("Tribal LLC Act"). Ex. B, Tribal LLC Act. The Tribal LLC Act established a "legal framework for organizing business entities under [tribal] law," and as its terms make clear, one of the statute's purposes is "to provide for the organization of arms of the tribe into entities to promote economic development and the general welfare of the [Tribe]." *Id.* at § 102(3). Businesses created under the Tribal LLC Act are thus economic arms and instrumentalities of the Tribe.

One of these businesses created under the Tribal LLC Act was Great Plains. Great Plains was established in May 2011 by a duly enacted resolution of the Tribal Council. Ex. C, Tribal Council Resolution #54293. In creating Great Plains, the Tribal Council explicitly stated that its

purpose was to "advance tribal economic development and to . . . address[] issues of public safety, health, and welfare . . . ." *Id.* at 1. The Tribe established a formal Operating Agreement for Great Plains, which sets forth the terms by which Great Plains is organized and operated. Ex. D, Operating Agreement of Great Plains Lending, LLC. The Tribe is the sole owner of Great Plains, and thus pursuant to the Operating Agreement, all profits and losses are allocated to the Tribe. *Id.* at Art. V, § 5.1. The revenues that the Tribe earns from Great Plains inure directly to the benefit of the tribal government and tribal members, as they are used to fund a variety of important social programs, such as housing and educational programs. Furthermore, Great Plains has created a number of on-reservation jobs for tribal members—jobs that are well-paid and provide meaningful on-the-job training.

Great Plains is controlled entirely by the Tribe. Its business operations are overseen by a multi-member Board of Directors. *Id.* at Art. III, § 3.1 (stating that "management of [Great Plains] shall be vested in the Board of Directors"). The Board fulfills a "collective management responsibility" pursuant to which it is required to "authorize major business actions, . . . adopt projections and business plans, . . . and review and monitor achievement of goals and objectives." *Id.* at § 3.3. The Board delegates more specific tasks to individual Board members. Those delegated responsibilities include "(i) developing strategic plans; (ii) developing business plans and projections; (iii) formulating marketing programs; (iv) scheduling and supervision . . . (v) purchasing materials and supplies . . . (vi) bidding individual work projects . . .; (vii) keeping all financial and business records . . . (viii) making any and all filings and registrations . . . (ix) preparing reports and other communications with the Tribe; and (x) taking such other administrative action as shall be required . . . ." *Id.* at § 3.2(b). These Board members are

appointed by the Tribal Council, and "may be removed at any time . . . with or without cause." *Id.* at § 3.5.

In addition to control over day-to-day business operations, the Tribe separately exercises independent *regulatory* control over Great Plains. The regulatory model is similar to that regarding tribal casino gaming. By duly enacted tribal law, the Tribe created an independent regulatory agency, known as the Otoe–Missouria Consumer Finance Services Regulatory Commission ("Commission"). The Commission enforces a tribal regulatory code, known as the Tribal Consumer Services Financial Ordinance ("Ordinance"). Ex. E, Ordinance, at § 7.1. In doing so, the Commission has licensed Great Plains, and oversees Great Plains, monitoring its business for compliance with the Ordinance and adherence to applicable federal consumer protection laws. Ex. F, License of Great Plains Lending, LLC.

As a wholly owned and operated enterprise of the Tribe, Great Plains was expressly vested with all privileges and immunities enjoyed by the Tribe, including immunity from unconsented suit. Ex. C, Tribal Council Resolution #54293 ("[T]he Otoe–Missouria Tribal Council does hereby form Great Plains Lending, LLC as a limited liability company wholly-owned by the Tribal government . . . with all the powers and attributes associated therewith, including, but not limited to, sovereign immunity."). It is undisputed that this immunity has never been waived, implicitly or explicitly, by the Tribe or Great Plains.

Notwithstanding Great Plains' immunity against suit, Plaintiff filed this suit against Great Plains, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Virginia law. Plaintiffs request class certification, declaratory and injunctive relief, and damages. In their Complaint, Plaintiffs do not allege that Great Plains or the Tribe have waived

their sovereign immunity to initiate this lawsuit, nor do they allege that Congress has abrogated said immunity for purposes of this proceeding.

### C. The Loan Agreement

Some of the named Plaintiffs voluntarily entered into consumer installment loan agreements ("Loan Agreement") with Great Plains in October 2016.[2]  In that Loan Agreement, it is made emphatically clear that Plaintiffs were entering into a transaction with an arm of the Otoe–Missouria Tribe, and that the transaction is therefore not governed by the laws of Virginia. The first substantive section of the Loan Agreement—titled "IMPORTANT DISCLOSURE"—sets forth, *inter alia*, the following:

> **PLEASE READ THIS DISCLOSURE CAREFULLY BEFORE SIGNING THIS AGREEMENT.  LENDER IS AN ARM OF THE TRIBE, IT IS A COMMERCIAL ENTITY FORMED PURSUANT TO TRIBAL LAW, IT IS OWNED AND OPERATED BY THE TRIBE AND IT FUNCTIONS AS A NON-PROFIT COMMERCIAL ENTITY OF THE TRIBE, FORMED FOR THE EXPRESS PURPOSE OF ECONOMIC DEVELOPMENT.  BOTH THE LENDER AND THE TRIBE ARE IMMUNE FROM SUIT IN ANY COURT UNLESS THE TRIBE, THROUGH ITS TRIBAL COUNCIL, EXPRESSLY WAIVES THAT IMMUNITY THROUGH A FORMAL WRITTEN RESOLUTION OF THE TRIBE'S TRIBAL COUNCIL.  THE LENDER IS REGULATED BY THE TRIBE'S CONSUMER FINANCE SERVICES REGULATORY COMMISSION (THE "COMMISSION").  YOUR RIGHT TO SUBMIT COMPLAINTS IS LIMITED TO THE DISPUTE RESOLUTION PROCESS SET FORTH IN THIS AGREEMENT AND TO THE COMMISSION IN ACCORDANCE WITH THE TRIBE'S CONSUMER LENDING CODE AND ACCOMPANYING REGULATIONS, IF ANY.**

Loan Agreement between Great Plains Lending, LLC and Lula Bell Williams (Oct. 5, 2016), at 8, attached as Ex. 3 to Plaintiffs' Complaint (bold in original).

---

[2] Significantly, some of the Plaintiffs in this case entered into loan agreements with co-defendant Plain Green, LLC, not with Great Plains.  Plaintiffs who have never been in a contractual relationship with Great Plains are unable to state a viable claim against Great Plains.

The Loan Agreement also includes a section titled "GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE."  That section provides that "[t]his Agreement . . . [is] governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America."  *Id.* at 7.  And as explained in more depth in the accompanying Motion to Compel Arbitration, the Loan Agreement also contained an Agreement to Arbitrate.

Notwithstanding the Agreement to Arbitrate and Great Plains' immunity against suit, Plaintiffs—a group of Virginia consumers, some of which may have received loans from Great Plains—filed this suit against Great Plains, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Virginia law.  Plaintiffs request class certification, declaratory and injunctive relief, and damages.[3]

## ARGUMENT

### I. GREAT PLAINS' SOVEREIGN IMMUNITY DEPRIVES THIS COURT OF SUBJECT MATTER JURISDICTION.

#### A. Standard of Review Under Rule 12(b)(1).

The defense of tribal sovereign immunity is properly raised in a motion to dismiss for lack of subject matter jurisdiction.  FED. R. CIV. P. (1); *Global Mail Ltd. v. U.S. Postal Service*, 142 F.3d 208, 210 (4th Cir. 1998).  Such motions are considered *factual* challenges, as they challenge the subject matter jurisdiction of the court apart from the pleadings.  *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  That is, in reviewing a factual challenge, the court may go beyond the four corners of the complaint.  *Id.*  The court should consider plaintiffs' allegations only "as mere evidence on the issue, and may consider evidence outside the pleadings

---

[3] Additional details regarding the loan agreement are set forth in the Motion to Compel Arbitration, filed simultaneously with this Motion.

without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac Ry. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). As always, the plaintiff shall bear the burden of proving that subject matter jurisdiction exists. *Id.* And because this is a factual challenge, "the presumption of truthfulness normally accorded to a complaint's allegations does not apply." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

  **B. As an Arm of the Tribe, Great Plains Retains Immunity From All Judicial Proceedings.**

  Federally recognized Indian tribes, as sovereign governments, possess a common-law immunity against suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). Their immunity has been recognized by the Supreme Court "for well over a century" and has been consistently reaffirmed time and again. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2040 (2014) (Sotomayor, J., concurring); *see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505 (1991); *Puyallup Tribe v. Dep't of Game of Washington*, 433 U.S. 165 (1977); *United States v. U.S. Fidelity & Guaranty Co.*, 309 U.S. 506 (1940); *Parks v. Ross*, 11 How. 362 (1851). The doctrine of tribal sovereign immunity is, by now, "firmly ensconced in our law." *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006).

  Sovereign immunity is a "core aspect" of tribal sovereignty. *Bay Mills*, 134 S. Ct. at 2030. It forms a critical defense of the tribe's sovereign status, as unconsented lawsuits pose the grave threat of interfering with both a tribe's fiscal well-being and its political autonomy. *Santa Clara*, 436 U.S. at 71 (finding that Congress did not abrogate tribal sovereign immunity through the Indian Civil Rights Act because doing so would "intrude needlessly on tribal self-government"). Indeed, immunity is considered a "necessary corollary to Indian sovereignty and

self-governance." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 476 U.S. 877, 890 (1986).

In light of its status as a central feature of tribal government, immunity is subject to diminution only at the hands of Congress, which has "plenary authority" over Indian affairs. *Bay Mills*, 134 S. Ct. at 2030. Congress has, at times, exercised its power to authorize suits against tribes, such as certain suits that allege a violation of Tribal–State gaming compacts under the Indian Gaming Regulatory Act. *See* 25 U.S.C. § 2710(d)(7)(A)(ii). But Congress has never granted a blanket authorization for suits against tribes. In fact, Congress has affirmatively declined to enact legislation that would do so. *See* Andrea M. Seielstad, *The Recognition and Evolution of Tribal Sovereign Immunity Under Federal Law: Legal, Historical, and Normative Reflections on a Fundamental Aspect of American Indian Sovereignty*, 37 Tulsa L. Rev. 661, 726–29 (2002). Deferring to congressional judgment, the Supreme Court has thus properly explained that "it is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity." *Bay Mills*, 134 S. Ct. at 2037.

Though Congress can limit or even abolish tribal sovereign immunity at-will, barring such a drastic measure, tribal sovereign immunity remains extensive. Unlike the immunity accorded to foreign governments, with tribal sovereign immunity there is no "commercial activity" exception. *See Kiowa*, 523 U.S. at 760. Indeed, it does not matter whether the basis for the underlying suit relates to "governmental" activity or "commercial" activity; nor does it matter whether the activity takes place on- or off-reservation. *Id.* In all of these instances, the tribe is immune.

Tribal immunity also extends to a tribe's political and economic subdivisions, including its wholly owned business entities, which are treated under the law as "arms of the tribe." The

Supreme Court has expressly recognized this component of the doctrine, acknowledging that "tribal business ventures" are immune from suit. *Okla. Tax Comm'n*, 498 U.S. at 510; *see also Inyo Cnty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 705 n.1 (2003). However, the Supreme Court has not set forth a test that the lower courts may use to determine whether an entity is, in fact, an arm of a tribe. The Fourth Circuit, for its part, has also acknowledged that "tribal entities are immune from [suit]," but it has likewise not articulated any specific test. *See Thomas v. Dugan*, 168 F.3d 483 (4th Cir. 1998).

In the absence of guidance from the Supreme Court or the Fourth Circuit, district courts within the Fourth Circuit—*including this court*—have followed the most prevalent arm-of-the-tribe test, which comes from the Tenth Circuit case of *Breakthrough Mgmt., Grp, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). Under *Breakthrough*, in determining whether an entity is an arm of the tribe, courts consider six factors: (1) the method of creation of the entity; (2) the purpose of the entity; (3) the entity's structure, ownership, and management, including the tribe's control over the entity; (4) whether the tribe intended for the entity to have sovereign immunity; (5) the financial relationship between the tribe and the entity; and (6) whether the purposes of tribal sovereign immunity are served by granting sovereign immunity to the entity. *Id.* at 1187.

Great Plains easily meets this standard. Indeed, the analysis closely tracks that of a recent decision from this Court, *Howard v. Plain Green, LLC*, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017). In that case, brought under the Fair Credit Reporting Act ("FCRA"), a tribal entity named Plain Green, LLC ("Plain Green")—co-Defendant in this litigation—was held to be an arm of the Chippewa-Cree Tribe, a federally-recognized Indian tribe, and thus immune from suit. In rendering its decision, this Court applied the six-factor analysis set forth in *Breakthrough* and

11

found that each factor weighed decisively in favor of holding that Plain Green is an arm of the tribe.[4] In doing so, the court looked primarily to Plain Green's Articles of Organization, and found that: (1) Plain Green was created pursuant to tribal law; (2) it was established for the express purpose of improving the tribe's well-being; (3) it is owned and controlled by the tribe; (4) the tribe intended to confer immunity onto Plain Green; (5) the profits of Plain Green inure to the tribe's benefit; and (6) the purposes of sovereign immunity are well-served by recognizing Plain Green's immunity, as Plain Green "promotes economic development and self-sufficiency, which is a central purpose underlying tribal immunity." *Id.* at *4. Applying the same framework in this case, it is clear that Great Plains is an arm of the Otoe–Missouria Tribe. *See also Everette v. Mitchem*, 146 F. Supp. 3d 720 (D. Md. 2015).

The first *Breakthrough* factor—method of creation—weighs in Great Plains' favor because Great Plains was clearly established pursuant to tribal law. More specifically, Great Plains was created in May 2011 through duly enacted Tribal Council Resolution #54293. Ex. C, Tribal Council Resolution #54293. Great Plains is organized under the Tribal LLC Act, which, as excerpted above, was enacted to provide a "legal framework for organizing business entities under [tribal] law," and "to provide for the organization of arms of the tribe into entities to promote economic development and the general welfare of the [Tribe]." Ex. B, Tribal LLC Act, at § 102(3); *see Howard*, 2017 WL 3669565, at *3 (applying the first *Breakthrough* factor to co-defendant Plain Green).

The second *Breakthrough* factor—the purpose of the entity—weighs in favor of Great Plains because it is clear that Great Plains was established to promote the Tribe's economy and to improve the health and welfare of the tribal membership. Indeed, the resolution creating Great

---

[4]    Magistrate Judge Douglas E. Miller's Report and Recommendation adopted, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017).

Plains explicitly states that it was created to "advance tribal economic development and to . . . address[] issues of public safety, health, and welfare . . . ." Ex. C, Tribal Council Resolution #54293. As explained above, the revenues earned from Great Plains go directly to the benefit of the Tribe, as they are used to fund important tribal programs. Great Plains has also created numerous jobs for tribal members, thereby further enhancing the Tribe's economy. *See Howard*, 2017 WL 3669565, at *3 (applying the second *Breakthrough* factor to co-defendant Plain Green).

The third *Breakthrough* factor—structure, ownership, and management—weighs in favor of Great Plains because Great Plains is 100% owned and operated by the Tribe, and additionally fully regulated by the Tribe pursuant to tribal law. As to structure and ownership, Great Plains is an LLC created under tribal law, of which the Tribe holds the sole ownership interest. Ex. D, Operating Agreement of Great Plains Lending, LLC, at Art. V ("All Profits and Losses shall be allocated to the Tribe as the sole Member."). As to management, Great Plains' day-to-day business operations are overseen by a Board of Directors appointed by the Tribal Council. And as explained above, those Board members are responsible for the same full range of business decisions that any business managers are: strategy, marketing, scheduling and supervision, purchasing, recordkeeping, etc. In the event the Tribal Council is displeased with the manner in which the Board of Directors carries out these duties, it may remove Board members at any time, with or without cause. *Id.* at Art. III, §§ 3.1, 3.2(b), 3.3, 3.5. Furthermore, aside from control over business operations, the Tribe also has *regulatory* control over Great Plains. *See generally* Ex. E, Ordinance. The Tribe's independent regulatory agency—the Commission—oversees Great Plains' activities to ensure that business is conducted responsibly and in accordance with

tribal and applicable federal laws. *See Howard*, 2017 WL 3669565, at *4 (applying the third *Breakthrough* factor to co-defendant Plain Green).

The fourth *Breakthrough* factor—the Tribe's intent—weighs in Great Plains' favor because there can be no doubt that the Tribe intended to vest Great Plains with sovereign immunity. Indeed, the resolution creating Great Plains plainly states that it is to be vested "with all the powers and attributes associated [with tribal sovereignty], including, but not limited to, sovereign immunity." Ex. C, Tribal Council Resolution #54293. Moreover, the Tribal LLC Act, under which Great Plains was organized, provides explicitly that "[i]f the Tribe is the sole Member of an LLC formed under this Act, such LLC shall possess the Tribe's sovereign immunity from suit . . . ." Ex. B, Tribal LLC Act, at § 108(5). Of course, Great Plains is a tribal LLC created under the Tribal LLC Act, and the Tribe is the sole member of that LLC. Accordingly, under the Tribal LLC Act, Great Plains is vested with the Tribe's immunity from suit. *See Howard*, 2017 WL 3669565, at *4 (applying the fourth *Breakthrough* factor to co-defendant Plain Green).

The fifth *Breakthrough* factor—the financial relationship between the Tribe and the entity—weighs in Great Plains' favor because all of the revenues earned by Great Plains inure to the direct benefit of the Tribe and its members. Indeed, because the Tribe holds the sole ownership interest in Great Plains, 100% of profits and losses are allocated to the Tribe. Ex. D, Operating Agreement of Great Plains Lending, LLC, at Art. V, § 5.1. These revenues fund important tribal programs which could otherwise not exist in their current form. Additionally, the revenues provide for a number of important on-reservation jobs for tribal members. Hence, there can be no question that the financial relationship between the Tribe and Great Plains

weighs in favor of Great Plains' arm-of-the-tribe status. *See Howard*, 2017 WL 3669565, at *4 (applying the fifth *Breakthrough* factor to co-defendant Plain Green).

Finally, the sixth *Breakthrough* factor—the purposes of sovereign immunity—also weighs in Great Plains' favor. Great Plains was created specifically to further the Tribe's self-determination by encouraging the development of the Tribe's economy. Extending immunity to Great Plains "protect[s] a significant source of the Tribe's revenue from suit, thereby directly protecting the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general." *See Everette*, 146 F. Supp. 3d at 725 (quoting *Allen v. Gold Country Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006)); *see also Howard*, 2017 WL 3669565, at *4 (applying the sixth *Breakthrough* factor to co-defendant Plain Green).

In sum, all of the *Breakthrough* factors weigh in Great Plains' favor, and this Court should find that Great Plains is an arm of the Tribe and thus immune from suit. This immunity has not been waived by the Tribe or Great Plains, nor has it been abrogated by Congress. Accordingly, this Court lacks subject matter jurisdiction and the instant action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Plaintiffs have filed this putative class action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), essentially claiming that Great Plains violated RICO as well as Virginia law by collecting "unlawful debt." In so claiming, Plaintiffs seek various forms of equitable and monetary relief. In a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court may accept as true well-pleaded factual allegations in the complaint, but should not accept as true any legal conclusions made by the plaintiff. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

For the reasons set forth below, Plaintiffs' theory of RICO liability—"collection of unlawful debt"—as well as their requests for equitable relief demonstrate fundamental defects in their case, requiring dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Finally, as to Count Four alone, that Count should be dismissed because it is duplicative. These defects are addressed in turn.

A.   **Plaintiffs Have Failed to State a Claim Under RICO §§ 1962(b) and (c) Because the Debt Associated with Plaintiffs' Claims is Not "Unlawful."**

Plaintiffs' theory of RICO liability is that Great Plains purportedly engaged in the collection of unlawful debt in violation of 18 U.S.C. § 1962(c). *See* Complaint at ¶¶ 94. In addition to the substantive RICO claim under § 1962(c), Plaintiffs have filed RICO conspiracy claims under § 1962(d), alleging that Great Plains "enter[ed] into a series of agreements to violate § 1962(c)." *See* Complaint at ¶ 105. Under the doctrine of supplemental jurisdiction, Plaintiffs have also alleged state-law claims pertaining to violation of Virginia usury laws and unjust enrichment, with the unjust enrichment claim premised on the theory that "the loans made by Great Plains to Virginia consumers were void and unenforceable." *See id.* at ¶¶ 109–17, 137. So ultimately, Plaintiffs' entire theory of the case relies on the premise that the debt at issue in this litigation is "unlawful" under RICO.[5]

The term "unlawful debt" is defined as "a debt (A) incurred . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business . . . of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is

---

[5] Plaintiffs have also filed a standalone claim for "Declaratory Judgment," included as Count Four in the Complaint. Count Four seeks a declaratory judgment that the choice-of-law clause and arbitration clause in the loan agreements are unenforceable. As explained *infra*, Count Four must also be dismissed on the basis that it is duplicative.

at least twice the enforceable rate." § 1961(6). Plaintiffs' argument that the debt is "unlawful" thus relies on the proposition that state law applies to the loans.

However, state law does not apply, for the significant reason that the Plaintiffs expressly agreed to the application of tribal and not Virginia state law to the transactions at issue. Indeed, the choice-of-law clause in these loan agreements is enforceable under Virginia Supreme Court precedent. That is, even if Virginia law applied, *under Virginia law*, the parties to a loan agreement are free to designate another jurisdiction's law as governing the transaction and they have done so here. Accordingly, because Virginia law does not apply to the loans at issue in Plaintiffs' Complaint, Plaintiffs have failed to state a claim upon which this Court can afford relief.

### 1. The choice-of-law clause is enforceable pursuant to Virginia law.

Because the loans at issue are made legally pursuant to Tribal and not state law, the debt at issue is not "unlawful" as alleged by Plaintiffs. Notwithstanding this, even if state law *could* apply, the outcome in this case would be the same—that the debt is not "unlawful." This is because Virginia law regarding the enforceability of choice-of-law provisions clearly permits parties to a loan agreement to designate jurisdictions other than Virginia as governing the applicable transaction. And this remains true even if the chosen jurisdiction has no usury cap whatsoever, such as in *Settlement Funding v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007).

*Settlement Funding* involved a dispute regarding the enforceability of a security interest in lottery winnings. Carla Von Neumann Lillie ("Lillie"), winner of a Virginia lottery, redeemed a ticket entitling her to $1,000 per month for the rest of her life. *Id*. Later, Lillie took out a loan for $29,000 plus interest, which she agreed to pay back in $500 installments for a period of 178

months. The loan agreement included a choice-of-law provision, which stated that disputes would be decided according to Utah law. When Lillie stopped making payments, Settlement Funding (the noteholder) sought to enforce a security interest in the lottery payments pursuant to a UCC-1 Financing Statement filed in conjunction with a promissory note. Lillie objected, basically claiming that the security interest in the lottery payments was unenforceable because the underlying loan was usurious. *Id.*

The Virginia Supreme Court rejected Lillie's argument, holding that "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Id.* at 80, 645 S.E.2d at 438. The Court acknowledged that "Utah has not established any limits on maximum rates of interest for consumer loans," but nonetheless concluded that the choice-of-law clause was enforceable. *Id.* at 81, 645 S.E.2d at 439. On remand, the Circuit Court ruled that because "Utah does not have an affirmative claim for usury . . . the Loan Agreement is not usurious and Settlement Funding may collect both the principal sum of Ms. Lillie's loan and all interest owed thereon." *Commonwealth v. Settlement Funding*, 75 Va. Cir. 248 (Cir. Ct. Va. 2008).

*Settlement Funding* is emblematic of the Commonwealth's longstanding practice of upholding choice-of-law clauses. Virginia law favors enforcing contractual choice-of-law provisions, almost always giving them full effect. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). Virginia has long recognized that parties to a contract may agree in advance which jurisdiction's law will apply to their transaction. *Union Cent. Life Ins. Co. v. Pollard*, 94 Va. 146, 151-52, (1896). The Supreme Court of Virginia has instructed: "where parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law

of a particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342 (1990) (citing *Union Cent. Life Ins. Co.*, 94 Va. at 151-52). *Settlement Funding* is thus not an outlier, but simply part of the larger fabric of Virginia law upholding "traditional concepts of freedom of contract." *See id.*

In this case, as in *Settlement Funding*, the parties have chosen another jurisdiction's law as governing the transaction. The parties expressly agreed upon and chose the law of the Otoe–Missouria Tribe, and under that law, Plaintiffs cannot claim that anything about the loans is unlawful.

Accordingly, even assuming *arguendo* that Virginia law was not preempted wholesale by principles of federal Indian law,[6] under Virginia law (i.e., *Settlement Funding*), choice-of-law clauses are enforceable in loan agreements even when the selected jurisdiction has no usury cap. That is, even if it could apply, Virginia law would mandate enforcement of the choice-of-law clause designating the application of the Tribe's substantive law. Nothing in tribal law makes the debt in this case "unlawful," and therefore, Plaintiffs have failed to state a claim under 18 U.S.C. § 1962(c).

**2.** **In the absence of a live RICO claim, Plaintiffs' non-RICO claims should be dismissed.**

Having failed to plead the existence of "unlawful debt," Plaintiffs have clearly failed to state a claim that Great Plains has violated 18 U.S.C. § 1962(c). This requires dismissal of

---

[6] Though unnecessary for disposition of this case and the Court's determination on this Motion, Great Plains maintains that state law is inapplicable because it is preempted by operation of federal Indian law. That is, tribal sovereignty, as reflected and supported in federal law, operates as a shield against the unconsented application of state law. To the extent that Great Plains' pending Motions do not dispose of this action, Great Plains reserves the right to raise such arguments later in these proceedings, if necessary.

Count One of the Complaint, the substantive RICO claim. In turn, because Plaintiffs have failed to state a claim under § 1962(c), they have also failed to state a claim under § 1962(d), as there can be no "conspiracy" when the underlying RICO violation is dismissed. *GE Inc. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001) ("Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well."). This requires dismissal of Count Two.

But it is not just the RICO-specific claims that must be dismissed. The failure to plead an unlawful debt relates to the state law claims as well. To begin with, it would be improper to exercise supplemental jurisdiction over the state-law claims in the absence of a live RICO claim. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). But even if the Court were amenable to exercising supplemental jurisdiction despite the absence of a live federal claim, the state-law claims fail on their own accord, for the same reasons explained above regarding the preemption of state law and the choice-of-law clause. That is, Counts Three and Five—"Violations of Virginia Usury Laws" and "Unjust Enrichment"—must be dismissed because there can be no violation of Virginia usury law if Virginia usury law does not apply, and there can be no "unjust enrichment" because Virginia law could not make the loans void or unenforceable.[7]

## B.   Plaintiffs Have Failed to State a Claim Because RICO Does Not Authorize Private Civil Actions For Equitable Relief.

RICO allows private plaintiffs to bring a civil cause of action when they have been "injured in [their] business or property" as a result of a RICO violation. In this case, Plaintiffs

___

[7] Though Count Four—for "declaratory judgment"— was not brought pursuant to the doctrine of supplemental jurisdiction, again, as explained *infra*, it should be dismissed because it is duplicative of the other claims insofar as it merely seeks a legal finding that would be a necessary premise for the other claims.

claim to have injuries associated with the alleged "collection of unlawful debt," which, in their view, permits suit under RICO's civil provision, 18 U.S.C. § 1964. Plaintiffs' two RICO counts—for collection of unlawful debt under § 1962(c) and conspiracy to collect unlawful debt under § 1962(d)—each request both monetary damages *and* equitable relief. *See* Complaint at ¶ 93 ("Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein."); ¶ 105 (same). RICO, however, authorizes private plaintiffs to recover only damages, *not* equitable relief. Accordingly, Plaintiff has failed to state a claim upon which relief may be granted, and this case must be dismissed.

Though the Supreme Court has not addressed the issue of whether private plaintiffs may obtain equitable relief in a civil RICO action,[8] *this* Court has previously held, based on guidance from the Fourth Circuit, that "the statutory civil remedy for RICO violations—three times the value of damage to property—is exclusive." *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 599 (2009); *see also Johnson v. Collins Entmt. Co.*, 199 F.3d 710, 726 (4th Cir. 1999).

Because RICO does not authorize the injunctions sought in Plaintiffs' Complaint, it is clear that Plaintiffs have not stated a claim upon which relief may be granted. For example, this Court lacks statutory authorization to "prohibit[] Defendants from continuing to engage in [the lending activities at issue in this case]"; nor can the Court "order[] the dissolution" of Great

---

[8] In *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003), the United States filed an *amicus curiae* brief taking the official position that RICO does *not* authorize a private right to injunctive relief. *See* Brief for the United States as *Amicus Curiae*, at 6 (Consolidated Case, Nos. 01-1118 and 01-1119), *available at* https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2001-1118.mer.ami.pdf. The Supreme Court, however, decided the case on other grounds.

Plains.  *See* Complaint, at ¶¶ 93, 105; *cf. California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990) (recognizing dissolution and divestiture as forms of injunctive relief authorized by Clayton Act).

The existence of ancillary requests for monetary relief does not change the analysis, as the equitable remedies are intertwined with the requests for damages.  For instance, even if this Court had authority under RICO to award damages associated with injuries caused by the alleged "collection of unlawful debt," this Court would still lack the authority to issue an injunction prohibiting Great Plains from continuing to collect, in the future, on the alleged "unlawful debt" of members of the putative class.  Accordingly, Plaintiffs have failed to state a RICO claim, and the Court should dismiss this case with prejudice pursuant to Rule 12(b)(6).[9]

> **C.  Count Four of the Complaint Fails to State a Claim for Declaratory Judgment.**

The Court should dismiss Count Four because it is duplicative.  The "declaratory judgment" sought by Plaintiffs does not constitute a valid cause of action, but rather is merely a request that the Court make a legal finding that is a necessary premise of Plaintiffs' other claims.

Specifically, Plaintiffs seek a judicial declaration that "the choice of law and arbitration provisions are void and unenforceable as a matter of public policy."  Complaint at ¶ 128.  But because this is a RICO case alleging "unlawful debt," Count Four essentially just "seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation . . . ."  *Sofi Classics S.A. de. C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 239 (S.D.N.Y. 2006).  That is, Plaintiffs' substantive RICO claim under § 1962(c) already requires that the Court find that the debt is "unlawful," i.e., unenforceable under state law.  *See* 18 U.S.C. § 1961(6).

---

[9] As stated above, without a live RICO claim, it would be improper for this Court to maintain supplemental jurisdiction over Plaintiffs' state-law claims.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

It is well-established that "[w]hen a request for declaratory judgment is encompassed within a plaintiff's substantive claims, the plaintiff can obtain relief without the aid of a separate declaratory judgment." *In re Ryan*, 2012 WL 4959632, at *6 (N.D. Ill. Bankr. 2012). Accordingly, Count Four should be dismissed.

## CONCLUSION

For the reasons set forth above, the Court should grant Great Plains' Motion to Dismiss because the Court lacks subject matter jurisdiction over this action due to Great Plains' status as an arm of the Tribe, vested with sovereign immunity from suit. Accordingly, Plaintiffs' Complaint should be dismissed under Rule 12(b)(1). Additionally, Plaintiffs' Complaint fails to state a viable cause of action against Great Plains, and therefore, should be dismissed under Rule 12(b)(6).

GREAT PLAINS LENDING, LLC

By Counsel

_____/s/_____

Charles K. Seyfarth (VSB No. 44530)
LeClairRyan
919 East Main Street, 24th Floor
Richmond, Virginia 23219
Telephone:  (804) 916-7159
Facsimile:   (804) 916-7259
charles.seyfarth@leclairryan.com

Saba Bazzazieh (admitted *pro hac vice*)
Rosette, LLP
1100 H Street, NW, Suite 820
Washington, D.C. 20005
Telephone:   (202) 567-2941
Facsimile:   (202) 525-5261
sbazzazieh@rosettelaw.com

*Counsel for Great Plains Lending, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of September, 2017, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Kristi C. Kelly, Esquire
Andrew J. Guzzo, Esquire
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030

Leonard A. Bennett, Esquire
Craig C. Marchiando, Esquire
Elizabeth W. Hanes, Esquire
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601

James W. Speer, Esquire
VIRGINIA POVERTY LAW CENTER
919 East Main Street, Suite 610
Richmond, Virginia 23219

*Counsel for Plaintiffs*

Richard J. Zack, Esquire
Francis A. Weber, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799

Matthew D. Foster, Esquire
PEPPER HAMILTON LLP
600 14th Street, N.W., Suite 600
Washington, DC 20005

Joseph F. Halloran, Esquire
Jeffrey K. Holth, Esquire
JACOBSON, MAGNUSON, ANDERSON &
HALLORAN P.C.
180 East 5th Street, Suite 940
St. Paul, Minnesota 55101

*Counsel for Defendant Plain Green, LLC*

        /s/
Charles K. Seyfarth (VSB No. 44530)
LeClairRyan
919 East Main Street, 24th Floor
Richmond, Virginia 23219
Telephone:    (804) 916-7159
Facsimile:    (804) 916-7259
charles.seyfarth@leclairryan.com

*Counsel for Great Plains Lending, LLC*
