## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DARLENE GIBBS, *et al., on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.                                          Case No: 3:17-cv-00495-MHL

PLAIN GREEN, LLC. *et al,*

Defendants.

---

TAMARA PRICE, *et. al.*, *on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.                                          Case No: 3:18-cv-711-MHL

MOBILOANS, LLC,

Defendant.

---

DARLENE GIBBS, *et al., on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.                                          Case No: 3:18-cv-00654-MHL

MARK CURRY, *et al,*

Defendants.

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs, by Counsel, submit this Memorandum in support of their Motion for Final Approval of Class Action Settlement.

## I.    INTRODUCTION

This class settlement resolves three cases pending in this district against five defendants—Great Plains Lending, LLC, Plain Green, LLC, MobiLoans, LLC, Mark Curry, and Sentinel Resources, LLC. *Gibbs, et al. v. Plain Green, LLC, et al.*, Case No. 3:17-cv-00495-MHL (E.D. Va.); *Price, et al. v. MobiLoans, LLC*, Case No. 3:18-cv-711-MHL (E.D. Va.); *Gibbs, et al. v. Curry, et al.*, Case No. 3:18-cv-00654-MHL (E.D. Va.). Although filed separately, these cases are a few of the many related cases that have been filed across the country by Plaintiffs and their counsel.

The first wave of this litigation focused on Think Finance, its former chief executive officer, and its wholly owned subsidiaries. *See, e.g.*, *Gibbs v. Rees*, Case No. 3:17-cv-386-MHL (E.D. Va.) (filed on May 19, 2017) (herein referred to as *Gibbs I*). After filing against Think Finance, Plaintiffs subsequently filed a case on July 11, 2017, against the tribal lending entities, Plain Green and Great Plains. *See Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.); *see also Brice v. Plain Green*, Case No. 3:18-cv-1200 (N.D. Cal). During this litigation, Plaintiffs obtained a significant amount of discovery, prompting the filing of several cases against other co-conspirators involved in this nationwide scheme, as well as another tribal lending entity involved with Think Finance. *See, e.g.*, *Gibbs v. Curry*, 3:18-cv-654 (E.D. Va.) (filed on Sept. 25, 2018) (hereafter *Gibbs IV*); *Burney v. Curry*, Case No. 8:18-cv-03083 (M.D. Fla.); *Price v. MobiLoans*, Case No. 3:18-cv-711 (E.D. Va.).[1]

---

[1] Each one of these cases filed by Plaintiffs is now pending before this Court except for *Gibbs I*, which was halted due to the filing of Think Finance's bankruptcy in October 2017, resulting in the

Over the past two years, Plaintiffs have relentlessly litigated these cases on multiple fronts, primarily in this Court and the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), but also in Florida and California federal courts. At time, various members of Plaintiffs' counsel were working almost full-time on this litigation. Millions of documents were produced; and dozens of witnesses were deposed. A lot was at stake—for both the consumer borrowers and defendants, as well as the industry as a whole. And even putting aside the additional complications created by Think Finance's bankruptcy, these cases are inherently complex and required Plaintiffs to fend off a number of unique and potentially game-changing defenses, including sovereign immunity assertions, arbitration, standing challenges, and requests for multidistrict litigation.

After more than two years of intense and complicated litigation, the Parties entered into a Class Action Settlement Agreement and Release (the "Settlement Agreement"), which was entered into after a series of mediations between the Parties. The Settlement Agreement proposes the settlement of all claims for the putative classes pled against the Defendants Great Plains Lending, LLC, Plain Green, LLC, MobiLoans, LLC, Mark Curry, and Sentinel Resources, LLC. This settlement was entered into as part of a global resolution of most of the Think Finance related litigation, including the bankruptcy matter which involved a significant number of stakeholders, such as the Consumer Financial Protection Bureau, the Pennsylvania Attorney General, Think Finance and its subsidiaries, Victory Park Capital Advisors, GPLS, the Official Unsecured Creditors Committee, and Plaintiffs.

---

imposition of the automatic stay. *See Gibbs I*, Case No. 3:17-cv-495 (E.D. Va.) at ECF No. 87 (Think Finance's notice of filing bankruptcy).

The Settlement Agreement provides huge benefits to Class Members – headline making benefits.[2] In addition to returning millions of dollars to consumers, the settlement requires cancellation of over $380 million in outstanding loans originated by Great Plains, Plain Green, and MobiLoans—a result unachievable in the bankruptcy case without the addition of the tribal lending entities. All consumer borrowers will receive a financial benefit in the form of a cash payment or loan elimination, as well as deletion of the tradelines from their credit reports. This settlement is also conditional upon the Bankruptcy Court's final approval of the class settlement involving Think Finance, which results in significant monetary benefits to Class Members and is attached as an Exhibit to the Settlement Agreement.

The Court held a preliminary approval hearing on July 16, 2019, and granted preliminary approval of the Settlement on July 17, 2019. *Gibbs II*, No. 3:17-cv-00495-MHL, ECF No. 123. The Settlement Administrator notified the 1,045,248 Class Members through the Court-approved mailing. *See* Ex. 1, Declaration of RSM at ¶ 6. Class notice is presumed to have been successfully delivered to 98.5% of Class Members (and 98.29% of Pennsylvania Class Members), none of whom have objected, and the Settlement Administrator has only received 9 requests to be excluded from the Class. Ex. 1, RSM Decl. at ¶¶ 17, 25, 31. Based on the foregoing and as more fully detailed below, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Parties have moved the Court to confirm its certification of the proposed Class and approve the proposed Class

---

[2] Literally. Wall Street Journal, Virginia Pilot, Daily Press, Dallas Morning News, Detroit Free Press have each reported on this Settlement. *See, e.g.*, https://www.wsj.com/articles/think-finance-will-cancel-loans-in-nationwide-settlement-11560546374; https://www.pilotonline.com/business/article_9c66d86c-9f28-11e9-be12-f7242341ca1a.html; https://www.dailypress.com/government/dp-nws-tribal-loans-20190703-story.html; https://www.dallasnews.com/business/2019/06/18/fort-worth-firm-to-pay-back-39-7-million-on-payday-loans-that-charged-375-interest/;    https://www.freep.com/story/money/personal-finance/susan-tompor/2019/07/12/plain-green-loans-litigation/1685589001/.

Settlement, award attorneys' fees, costs, and the Class Representative Service Awards and dismiss the claims with prejudice.

## II.    BACKGROUND OF THE LITIGATION AND CLAIMS TO BE SETTLED

The first of the several related actions was filed nearly two and a half years ago against Think Finance, its former chief, executive officer, and its wholly-owned subsidiaries. *See Gibbs I*, Case No. 3:17-cv-386-MHL (E.D. Va.) (filed on May 19, 2017). After commencing the case, Think Finance and the other defendants filed 8 motions to dismiss (*See* ECF Nos. 16, 18, 20, 22, 24, 26, 28, 30), which were fully briefed on October 6, 2017, *i.e.*, shortly before Think Finance filed for bankruptcy on October 23, 2017. *See In re Think Finance, LLC*, Case No. 17-33964 (Bankr. N.D. Tex.). Prior to Think Finance's bankruptcy filing, Plaintiffs engaged in significant written discovery as to Think Finance, Rees and GPLS and served numerous third-party subpoenas.

After filing *Gibbs I*, Plaintiffs subsequently filed a case against two of the tribal lending entities, Great Plains and Plain Green, who partnered with Think Finance. *Gibbs II*, Case No. 3:17-cv-495 (E.D. Va.). As a result of these cases, Plaintiffs obtained a significant amount of discovery (primarily through the voluminous document production made by Think Finance), prompting the filing of several cases against other co-conspirators involved in this nationwide scheme. *See Gibbs v. Curry*, 3:18-cv-654 (E.D. Va.) (filed on Sept. 25, 2018) (hereafter *Gibbs III*); *Burney v. Curry*, Case No. 8:18-cv-03083 (M.D. Fla.).[3] Plaintiffs also sued another related tribal lender, MobiLoans, LLC. *Price v. MobiLoans, LLC*, Case No. 3:18-cv-711-MHL (E.D. Va.) (filed on October 17, 2018).

---

[3] Plaintiffs also filed *Gibbs v. Haynes Investments, LLC*, Case No. 3:18-cv-00048 (E.D. Va.) (hereafter "*Gibbs IV*") and *Gibbs v. Stinson*, Case No. 3:18-cv-00676-MHL (E.D. Va.) (hereafter "*Gibbs V*"). Neither this settlement nor the bankruptcy settlement covers any of the claims against the defendants in *Gibbs IV* and *Gibbs V*.

*Gibbs I*, in part, was halted due to the filing of Think Finance's bankruptcy, which resulted in the imposition of the automatic stay as to Think Finance and its subsidiaries. *See Gibbs I*, Case No. 3:17-cv-495 (E.D. Va.) at ECF No. 87 (Think Finance's notice of filing bankruptcy). Over Plaintiffs' opposition, the Court also transferred the claims against the remaining non-bankruptcy defendants, Rees and GPLS, finding that Plaintiffs' claims were sufficiently "related to" Think Finance's bankruptcy. *See Gibbs I*, Case No. 3:17-cv-495 (E.D. Va.), Mar. 23, 2019 Memo. Op. at ECF No. 131 (granting motion to transfer).

Plaintiffs continued to fiercely litigate their claims in the Bankruptcy Court, filing adversary proceedings and proofs of claim against the Debtor defendants. In addition to engaging in extensive discovery, numerous contested motions were filed and heard including motions for application of Bankruptcy Rule 7023 (which included a three-day trial), summary judgment, and class certification. On the eve of trial—after the Parties filed exhibit lists and other typical pretrial filings—the Parties agreed to certain "essential terms" that formed the basis for settlement of that case. Ultimately, after months of arms-length negotiations, and with the assistance of the Honorable David R. Jones, Chief United States Bankruptcy Judge for the Southern District of Texas, the Parties reached a Global Settlement of the Bankruptcy case. The terms of that agreement are incorporated into the Settlement Agreement.

Each of these cases alleges violations of the Racketeer Influenced and Corrupt Organizations Act and various state law claims based on Defendants' lending practices, including usury and unjust enrichment laws. Generally, Plaintiffs alleged that Defendants violated these laws by charging excessive annual interest on consumer payday loans made to consumers across the country. Throughout the pendency of each of these cases, as well as *Gibbs I* and the related bankruptcy proceeding, the Parties have engaged in substantial discovery and motions practice, including the production of over a million pages of documents and over forty depositions of critical

witnesses in the Defendants' lending operations, dozens of third-party subpoenas, various expert witnesses and Plaintiffs. The Parties have fully discovered the facts and defenses at issue in the case.

Throughout the pendency of each of the cases, Defendants have vigorously denied Plaintiffs' allegations, disputed that state and federal law were applicable to the loans, disputed that Plaintiffs' claims properly stated a violation of those laws, contested the Court's personal jurisdiction, and raised other unique defenses, including sovereign immunity assertions and requests to compel arbitration. Though Defendants have not conceded liability, it is apparent that they felt vulnerable to at least a potential finding that their loans violated federal and state law. Similarly, Plaintiffs were motivated to obtain significant and immediate relief for consumers and avoid substantial litigation risks and uncertainties, including what would have been exhaustive appeals of any favorable decisions.

Therefore, after significant settlement efforts, both through formal and informal settlement negotiations, the Parties arrived at the proposed Settlement, which resolves all of the claims raised in the three cases. Defendants deny liability and that a class is appropriate for Rule 23 certification on the claims asserted in this action, but Defendants do not oppose the certification of the Settlement Class for the purpose of resolving this action. In its preliminary approval order, this Court found conditionally and in the specific context of this Settlement, that the prerequisites for a class action under Rules 23(a) and (b)(3) had been satisfied. Order Granting Prelim. Approval of Class Action Settlement, ECF No. 123 ¶ 4 (hereinafter "Prelim. Approval Order").

## III.   CLASS ACTION SETTLEMENT

**A.   The Settlement terms provide significant and meaningful relief to consumers.**

Under the Settlement Agreement, the Parties agreed to resolve the claims of the Class of persons defined as follows (the "Settlement Class"):

> All persons within the United States to whom Great Plains Lending has lent money; all persons within the United States to whom Plain Green lent money prior to June 1, 2016; and all persons within the United States to whom MobiLoans lent money prior to May 6, 2017.

The Settlement Class consists of approximately 1,045,248 individual consumers.

The proposed Settlement provides significant and meaningful relief to consumers nationwide. Generally, as detailed below, Class Members receive injunctive relief, in the form of loan forgiveness of over $380 million in loans, and deletion of close to one million tradelines, as well as other associated relief. *See* Ex. 2, Declaration of Kristi C. Kelly at ¶ 36. In addition, Class Members will receive cash payments. Plaintiffs achieved the proposed settlement in the face of substantial defense pressures. For example, all three tribal lending entities asserted entitlement to sovereign immunity.[4] Both Plain Green and Great Plains also moved for arbitration and moved for an interlocutory appeal when the Court denied the motion without prejudice pending its determination of the issue of sovereign immunity. *See Gibbs I*, Case No. 3:17-cv-495 (E.D. Va.), July 25, 2018 Order at ECF No. 73; Aug. 3, 2018 Notice of Interlocutory Appeal at ECF No. 75; Aug. 6, 2018 Notice of Interlocutory Appeal at ECF No. 76. In addition to these legal obstacles, Plaintiffs also recognized that Defendants—who received far less of the revenue than Think Finance—faced multiple actions nationwide, threatening both the options and resources available for Class Settlement. Nevertheless, Plaintiffs were able to negotiate a settlement structure that will provide real benefits to consumers nationwide, both in the form of injunctive relief, as well as loan relief and/or cash payments to Class Members.

---

[4] *Compare Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) (reversing district court's decision that tribal lending entities were not arms of the tribe entitled to share in its immunity); *with People ex rel. Owen v. Miami Nation Enters.*, 211 Cal.Rptr.3d 837, 386 P.3d 357, 378 (2016) (reversing the California Court of Appeals' decision that entities qualified as arms of the tribe entitled to share in its immunity).

Because Plaintiffs' and Class Members' loans are held by three separate lending entities, the injunctive relief was tailored to each lending entity as follows:

- Great Plains injunctive relief: As of the Effective Date, Great Plains: (1.) will cancel all outstanding consumer loans that it originated and owns at the time of the signing of the Settlement Agreement as disputed debt; (2.) will cease collecting, selling, transferring, or assigning all outstanding consumer loans; (3.) will not sell personal identifying information obtained from its current or former borrowers; (4.) will assist Think Finance, LLC in the deletion of any tradelines that may be reported in its name; and (5.) will wind up its business and dissolve. ECF No. 114-1, Settlement Agreement § 4.01.

- Plain Green injunctive relief: As of the Effective Date, Plain Green: (1.) will cancel all outstanding consumer loans that it originated prior to June 1, 2016 that it owns at the time of the signing of the Settlement Agreement as disputed debt; (2.) will cease collecting, selling, transferring, or assigning all outstanding consumer loans that it originated prior to June 1, 2016; (3.) will not sell personal identifying information obtained from borrowers at origination in relation to any loans it owns at the time of the signing of this Settlement Agreement that were originated by Plain Green prior to June 1, 2016; and (4.) will assist Think Finance, LLC in the deletion of any tradelines that may be reported in its name for loans originated by Plain Green prior to June 1, 2016. ECF No. 114-1, Settlement Agreement § 4.02.[5]

- MobiLoans injunctive relief: For each loan that MobiLoans originated prior to May 6, 2017 in conjunction with services provided by Think Finance, MobiLoans: (1.) will cancel the portion of each consumer loan that was in existence prior to May 6, 2017 and remain in existence as of the Effective Date; (2.) will cease collecting, selling, transferring, or assigning the portion of each consumer loan that was in existence prior to May 6, 2017 and remain in existence as of the Effective Date; (3.) will not sell personal identifying information regarding any obligor a loan that was in existence prior to May 6, 2017 and remain in existence as of the Effective Date; (4.) use commercially reasonable effort to cooperate with Think Finance to remove and prevent reporting of derogatory tradelines originated by MobiLoans prior to May 6, 2017 and remaining in existence as of the Effective Date and reported in its name; and (5.) will cease using the services of each Excluded Entity in Arizona, Arkansas, Colorado, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, South Dakota and Virginia. ECF No. 114-1, Settlement Agreement § 4.03.

In addition to this injunctive relief, each of the Defendants is making a monetary payment, which shall be distributed to the Class Members in accordance with the Chapter 11 Bankruptcy Plan in the *Gibbs I*/Think Finance Bankruptcy case. Each Defendant is contributing as follows:

---

[5] June 1, 2016 is the cutoff for consumers whose loans were originated through Plain Green because it is the date that it ceased doing business with Think Finance. Thus, consumers who received loans from Plain Green after June 1, 2016, are differently situated with respect to the other class members.

- <u>Great Plains monetary payment</u>: Great Plains will pay Four Hundred Thousand Dollars ($400,000.00), plus no less than $3,553,721. This is the amount owed by Great Plains to GPLS under their Servicing Agreement, minus the One Million Dollar ($1,000,000) Holdback at the time Great Plains' dissolution is completed;

- <u>Plain Green monetary payment</u>: Plain Green will pay Nine Hundred, Seventy-Five Thousand Dollars ($975,000.00);

- <u>MobiLoans monetary payment</u>: MobiLoans will pay Nine Hundred, Seventy-Five Thousand Dollars ($975,000.00); and

- <u>Curry and Sentinel Resources monetary payment</u>: Mark Curry and Sentinel Resources will pay Ten Million Dollars ($10,000,000.00).

Thus, the total cash compensation is at least $15,903,721, in addition to other monetary benefits. As outlined in the attached Chapter 11 Bankruptcy Plan, a copy of which is attached as an Exhibit to the Settlement Agreement (ECF No. 114-1 at 57), the payments will be allocated to Class Members using a tiered formula depending upon the state law governing a particular class member.

The value of the loan cancellation is separate from each of the monetary contributions and exceeds $380 million. As to the deletion of over 900,000 derogatory tradelines, Dr. Stan Smith, opines that the value of deletion of the tradelines, although difficult to quantify, will have long lasting benefits, including increased credit scores, which correlates directly to a reduction in the cost of credit. *See* Ex. 3, Declaration of Stan V. Smith, ¶ 22.

In addition, the injunctive relief provided by the Settlement to all Class Members, regardless of their loan status, is significant. Specifically, Defendants have also agreed that they will not sell or transfer any remaining unpaid accounts, and that they will not sell Class Members' personal identifying information to third parties, including other internet lenders.

The non-monetary benefits to Settlement Class Members have also not been calculated as within the Settlement Fund, but constitute real benefits for Settlement Class Members, whose value

"would exceed hundreds of millions of dollars.  In fact, even using the conservative estimates, the total cumulative value of the settlement would be in the billions of dollars." *Id.* at ¶ 24.

Class members will receive these benefits without having to prove any harm or take any affirmative actions. In other words, Class Members will not be required to submit any forms or make any claims against the fund.

Plaintiffs also respectfully request that the Court approve the requested service award for their role as Class Representatives to compensate each Plaintiff for his/her effort in prosecuting this case, including retaining counsel, assisting in discovery (including depositions), and keeping abreast of the litigation. Defendants have agreed not to oppose the application for the service award, which is being sought in the amount of $7,500 each, for a cumulative maximum of $90,000. The Parties have agreed that service awards will be paid to Plaintiffs out of the Monetary Consideration portion of the Settlement in the amount approved by the Court. ECF No.  114-1, Settlement Agreement at § 5.03.

Class Counsel also respectfully request an award for attorneys' fees and costs in the amount of $5,248,227.93, which constitutes thirty-three percent (33%) of the cash consideration provided for by and as set forth in the Settlement Agreement, but just one percent (1%) of the total monetary value of the recovery Class Members will receive.  ECF No.  114-1, Settlement Agreement § 5.02.

**B.    Direct notice was sent to the Class.**

In its Preliminary Approval decision, the Court approved and ordered that notice be sent to Class Members by RSM US LLP as the Class Administrator. Prelim. Approval Order ¶¶ 8-10. Consistent with the Court's Order, the Class Administrator received the class list from Defendants in the form of loan data records. Ex. 1, RSM Decl. at ¶ 3. Through use of social security numbers, the Class Administrator reviewed the consolidated loan data for each borrower, instead of each loan. *Id.* at ¶ 4. This resulted in identification of 978,860 unique Class Members, some of which

11

had multiple loans. *Id*. at ¶¶ 4-5. On September 16, 2019, the Class Administrator received an additional file containing information on 73,608 additional loans, resulting in the identification of 66,388 additional Class Members, bringing the total class to 1,045,248 Class Members. *Id*. at ¶ 6.

On July 24-25, 2019, RSM arranged for the transmission of the e-mail notice to 836,571 Class Members. *Id*. at ¶¶ 10(a) (781,952), 18 (54,618). This e-mail deployment resulted in a total of 105,579 undeliverable email notices, i.e., less than 10% of the class. *Id*. at ¶¶ 11 (97,594), 19 (7,985). On July 24-25, 2019, notices were then mailed to 142,290 Class Members for whom: (1) RSM did not have an e-mail address according to the data provided by Defendants; or (2) whose e-mail addresses were not verified. *Id*. at ¶¶ 12 (130,788), 20 (11,502). Notices were also mailed to 98,256 Class Members who were initially sent an email notice on July 24 and July 25, but whose notices could not be successfully delivered. *Id*. at ¶¶ 13(a) (90,271), 21 (7,985). In addition, RSM arranged for the transmission of e-mail notice to the 66,388 additional Class Members identified in September 2019. *Id*. at ¶ 10(b). On September 25, 2019, notices were then mailed to 7,323 of the newly identified Class Members for whom: (1) RSM did not have an e-mail address according to the data provided by Defendants; or (2) whose e-mail addresses were not verified. *Id*. at ¶ 13(b).

As of November 12, 2019, the Class Administrator, RSM, had received 24,116 notices returned by the U.S. Postal Service as undeliverable without a forwarding address. *Id*. at ¶¶ 14 (22,386), 22 (1,730). RSM used a third-party service to attempt to update the addresses for those Class Members. *Id*. at ¶¶ 15, 23. After this update, it obtained new addresses for and re-mailed 15,628 of those Class Member's notices and 6,788 of these notices were returned undeliverable. *Id*. at ¶¶ 15 (14,558/6,319), 23 (1,070/469). After the attempts to email, mail, and obtain valid addresses from the most commonly used sources, 15,275 notices remain undelivered. *Id*. at ¶¶ 17 (14,146), 25 (1,129). Thus, RSM presumably delivered notice to 98.5% of Class Members.

The Class Administrator also established the Settlement Website, www.thinkfinancesettlement.com, which contains documents and information about the Settlement. *Id.* at ¶ 26.

RSM also established and maintained a toll-free number dedicated to this case to receive calls from Class Members with questions about the Settlement, where they received 22,129 calls. *Id.* at ¶ 30. Separately, Class Counsel's contact information and telephone number were included in the notice materials, *see, e.g.*, ECF No. 114-1. Additionally, an email was designated in the notice materials where Class Members could contact Class Counsel with questions about the Settlement. Ex. 2, Kelly Decl. at ¶ 37. The Class Administrator received and handled 6,834 email inquiries. Ex. 1, RSM Decl. at ¶ 27. Class Counsel received and responded to more than 2,000 emails and calls directly received from consumers. Ex. 2, Kelly Decl. at ¶ 37; Ex. 4, Bennett Decl. at ¶ 26; Ex. 5, Haac Decl. at ¶ 32.

Class Counsel has provided additional and substantial services to Class Members. In addition to providing the typical information or clarification sought by Class Members, Class Counsel also addressed and resolved substantive issues. For example, numerous Class Members had been contacted by debt collectors, and in many cases, had made separate payments to these entities. Class Counsel advised these consumers on their rights, and ensured that any payments made outside the Defendant's systems were credited to each individual Class Member. In other instances, Class Members did not know how to stop automatic withdrawals from their checking accounts. Class Counsel provided advice and necessary forms to ensure that no unnecessary payments were made. Class Counsel took time to answer questions and to substantively address Class Member issues, ensuring their rights were protected. Ex. 2, Kelly Decl. at ¶¶ 42, 43.

**C.      Class Members support the Settlement, and there are no governmental objectors.**

There are no objections to the Settlement, and only 9 consumers have opted-out. Ex. 1, RSM Decl. at ¶ 31.[6]

Further, RSM served the required Class Action Fairness Act notices on the state and federal attorneys general on July 1, 2019. ECF No. 122-5, Bingham Decl. at ¶ 7. This notice was "mailed by certified mail to 56 officials, including the Attorneys General of each of the 50 states, the District of Columbia and the United States Territories," as well as delivered to the Attorney General of the United States. *Id*. Counsel has not received any objections from any agency.

**D.      The Settlement Class will release all claims against the Released Parties.**

In return for the consideration provided to the Settlement Class described above, which does not require a showing of monetary harm, Class Members will release only claims against the Released Parties, "that relate to and/or arise out of loans made by and/or in the name of Great Plains, Plain Green prior to June 1, 2016, and/or MobiLoans prior to May 6, 2017." ECF No. 114-1, Settlement Agreement § 12.02.

## IV.      ARGUMENT

**A.      The Settlement is fair, reasonable, and adequate and should be approved.**

**1. <u>The Standard for Judicial Approval of Class Action Settlements.</u>**

"Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources." *S.C. Nat. Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) (quoting *Armstrong v. Board of School Directors*, 616 F.2d 305, 313 (7th Cir. 1980)).

---

[6] On September 16, 2019, Plaintiffs filed a motion to extend the time to opt out for 66,388 newly identified class members. *Gibbs II*, Case No. 3:17-cv-495, ECF No. 127. That same day, the Court granted this motion and extended the deadline until October 18, 2019, for the newly identified class members. As of the date of this filing, none of these class members have submitted an exclusion request.

Rule 23 of the Federal Rules of Civil Procedure requires that a court must approve the settlement before the parties may settle a class action. *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 571, 2016 WL 6909683 (E.D. Va. 2016). Where, as here, "a district court preliminarily approves a settlement after a hearing, the proposed settlement enjoys a presumption of fairness." *Id.* "First, the Court considers the fairness of the settlement, and then turns to its adequacy." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of the Court. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995) (citing *Jiffy Lube*, 927 F.2d at 158).

## 2. **The Notice to Class Members Was Reasonable and Satisfied Due Process.**

Rule 23(c)(2) requires that notice to the class be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

In this case, Class Members could be easily identified because the loan application required borrowers to provide, inter alia, their names, addresses, and e-mail addresses. *See, e.g.*, ECF No. 49-2, July 17, 2015 Loan Agreement. Using this information, the class list was compiled by Defendants and with the assistance of the Class Administrator and Class Counsel, reasonable measures were taken to locate updated addresses for the Class Members. Ex. 1, RSM Decl. at ¶¶ 3-7, 10-17. As this Court has held, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification

methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). Courts—including this Court and others within the Fourth Circuit—have approved mailed- notice programs that reached a much smaller percentage of class members than this class notice reached. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, No. 3:05cv00143 (E.D. Va. Aug. 29, 2006) (granting final approval where class notice had approximately 85% delivery).

As discussed in Part III.B, the Parties' efforts to provide Class Members with notice of the Settlement make it clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of Class Members; and (d) the amount of the Settlement. The Parties have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members were notified—in the best and most direct manner possible—of the Settlement's terms and significant benefits.

### 3. **The Settlement Agreement is fair and reasonable under *Jiffy Lube*.**

The next phase of the Court's determination of compliance with Rule 23(e)(2) typically requires a two-part analysis, referred to in this Circuit as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable," and then whether the settlement is "adequate." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

"The fairness analysis asks whether the parties settled the case through good-faith, arm's length bargaining and considers (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery conducted; (3) the circumstances surrounding settlement negotiations; and (4) the experience of counsel in the area of law." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp.

16

3d at 839 (citing *In re: NeuStar, Inc. Sec. Litig.*, No. 1:14–cv–885, 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015)). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's-length negotiations. *See S.C. Nat'l Bank*, 139 F.R.D. at 339. As discussed below, each of *the Jiffy Lube* factors are satisfied, and the Settlement Agreement is reasonable and fair.

**i. The posture of the case at settlement and the extensive discovery demonstrates that the Parties were fully informed in reaching the Settlement**. "Considering the posture of the case at the time of settlement allows the Court to determine whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'" *Brown*, 318 F.R.D. at 571. The second *Jiffy Lube* factor—the extent of discovery—ensures that all parties 'appreciate the full landscape of their case when agreeing to enter into the Settlement.'" *Id.* at 572. Here, there should not be any wariness of possible collusion considering the advanced posture of each one of these cases, as well as the broader litigation as a whole.

Although *Gibbs I* was technically a separate matter, this related litigation involved extensive discovery, including production and review of millions of documents, depositions of over approximately 45 witnesses (including experts), and dozens of third-party subpoenas. Ex. 2, Kelly Decl. at ¶ 33.

*Gibbs II*. Filed on July 11, 2017, *Gibbs II* had been litigated for almost two years before Plaintiffs reached a settlement with Plain Green and Great Plains. *See generally* ECF No. 1, Compl. (filed on July 11, 2017). During this two-year window, the Parties extensively litigated a number of issues and fought hard to advance their respective positions. *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 840 (explaining an "extensive and hard-fought process demonstrates an adversarial process far exceeding 'arm's length' and demonstrates that each side entered negotiations with a strong understanding of the issues in the case.").

*Gibbs III*. Plaintiffs alleged that Mark Curry and Sentinel Resources, LLC worked with Think Finance to create and operate Great Plains, including a consulting agreement allowing them to be the "exclusive provider of guidance and authority in business dealings between" Think Finance and Great Plains. *See generally Gibbs v. Curry*, Case No. 3:18-cv-654 (E.D. Va.), ECF No. 1-1 (attaching the consulting agreement). Because of their extensive litigation against other co-conspirators, Plaintiffs were able to quickly create leverage in this litigation, including moving for class certification before Curry and Sentinel Resources even responded to the complaint. ECF Nos. 13 & 14. While this motion was pending, the Parties also fully briefed three motions to dismiss on the basis of personal jurisdiction, arbitration, and failure to state a claim. ECF Nos. 18-22, 29-30. The Parties also engaged in discovery,[7] thereby appraising each side of the Parties' respective strength and weaknesses prior to their mediation on February 15, 2019, and subsequent negotiations needed to arrive at the settlement of those claims. The Parties participated in two separate mediations with the assistance of Rodney Max to get to a resolution.

*Price*. Through their litigation against Think Finance, Plaintiffs' counsel also uncovered a third lending arrangement involving Think Finance and the Tunica-Biloxi Tribe of Louisiana, who originated loans in the name of an entity named MobiLoans. Plaintiffs filed *Price* primarily to ensure that they could obtain cancellation of these loans—which required the agreement of MobiLoans—as part of the global settlement with the other defendants. Although this case was still in the early stages of its litigation, both Plaintiffs and MobiLoans were appraised of their respective positions due to the ongoing litigation against the other conspirators. Further, as evidenced by the Court's recent opinion granting a motion to compel arbitration arising from

---

[7] Although discovery was not as extensive in *Gibbs III*, this was primarily because Plaintiffs already possessed and had already assembled, and reviewed the documents related to Curry/Sentinel, which were included in Think Finance and the other co-conspirators' extensive productions.

MobiLoans' standard contract, MobiLoans possessed a viable defense to class certification and relief obtained for the hundreds of thousands of MobiLoans borrowers who are Class Members. *Gibbs V*, Case No. 3:18-cv-676 (E.D. Va. 2019), Sept. 30, 2019 Mem. Op. at ECF No. 114.

In addition to the extensive litigation undertaken in the cases before this Court, the posture of the litigation in the Bankruptcy Court further demonstrates how far the case progressed. In that case, there are over 1,500 docket entries. *See In re Think Finance, LLC*, Case No. 17-33964 (Bankr. N.D. Tex.). Although the primary focus must remain the posture of the cases before this Court, the litigation efforts in the related bankruptcy case demonstrate that there was anything but "possible collusion among the settling parties.'" *Brown*, 318 F.R.D. at 571.

**ii. The extensive, formal mediation efforts of the Parties demonstrates that the Settlement is fair and reasonable**. "The third *Jiffy Lube* fairness factor seeks to 'ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case.'" *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 840 (quoting *In re Mills Corp Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009)). "Courts look to the number of meetings between the parties to discuss settlement, the quality of those negotiations, and the duration of time over which negotiations took place." *Id.* (citing *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001)).

In this case, the Parties engaged in extensive, formal mediation efforts with the assistance of the Honorable David R. Jones, Chief Judge United States Bankruptcy Judge for the Southern District of Texas. Ex. 2, Kelly Decl. at ¶ 32. The first of these mediations occurred in Houston, Texas, on July 9, 2018, and lasted two days. *Id*. This mediation involved multiple parties, including Plaintiffs, Great Plains, Think Finance, GPLS, Victory Park, the Consumer Financial Protection Bureau, and the Pennsylvania Attorney General. *Id*. Over the course of the next year, the Parties continued to work together with Judge Jones, including an additional formal mediation in October

19

2018. *Id*. In the interim, the Parties also engaged in extensive informal mediation efforts, including countless telephone calls and multiple trips to Baltimore, Chicago, Philadelphia (to meet with representatives from Plain Green), and Washington, D.C., to bridge various divides (and to meet with representatives from MobiLoans). *Id*. In addition, Plaintiffs and Curry engaged in a formal mediation with Rodney Max on November 14, 2018 and February 15, 2019.

> ### iii. The experience of counsel also demonstrates that the Settlement is reasonable and fair.
> "The final *Jiffy Lube* 'fairness' factor looks to the experience of class counsel in this particular field of law." *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 841 (quoting *In re Mills*, 265 F.R.D. at 255). For starters, Class Counsel's experience and track record of success litigating complex class actions against tribal payday lenders is second to none, including Virginia's largest settlement to date involving tribal lending. *See, e.g. Hayes v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 at 9-12 (Jan. 20, 2017) (approving a $15 million class action settlement for Virginia consumers arising from a rent-a-tribe lending scheme). Indeed, this Court and many others have found the attorneys here are extremely qualified to represent a consumer class.[8] And, Class Counsel has been found qualified in comparable litigation. *Hayes v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 at 9-12.

Further, based on their expertise, Class Counsel endorse the Settlement as fair and adequate under the circumstances. Ex. 2, Kelly Decl. at ¶ 41; Ex. 4, Bennett Decl. at ¶ 27. Courts recognize

---

[8] *Dreher v. Experian Info. Sols., Inc.*, Case No. 3:11-cv-624 (JAG) (E.D. Va.); *Tsvetovat, v. Segan, Mason, & Mason, PC*, No. 1:12-cv-510 (TSE) (E.D. Va.); *Conley v. First Tenn. Bank*, No. 1:10-cv-1247 (TSE) (E.D. Va.); *Jenkins v. Equifax Info. Servs., LLC*, No. 3:15-cv-443 (E.D. Va.); *Manuel v. Wells Fargo Nat'l Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *15 (E.D. Va. Aug. 19, 2015) (finding Class Counsel "is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases"); *see Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D. Va. 2008).

that the opinion of experienced and informed counsel in favor of settlement should be afforded substantial consideration in determining whether a class settlement is fair and adequate. *See Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501–02 (E.D. Va. 1995) (concluding requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

### 4. Under *Jiffy Lube*, the Settlement is Adequate.

"The second *Jiffy Lube* factor, adequacy, requires the court to 'weigh the likelihood of the plaintiffs' recovery on the merits against the amount offered in the settlement.'" *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d at 841 (quoting *In re: NeuStar, Inc.*, 2015 WL 5674798, at *11). The relevant adequacy factors to be considered may include: (1) the relative strength of the plaintiff's case on the merits; (2) any difficulties of proof or strong defenses the plaintiff would likely encounter if the case were to go to trial; (3) the expected duration and expense of additional litigation; (4) the solvency of the defendant and the probability of recovery on a litigated judgment; (5) the degree of opposition to the proposed settlement; (6) the posture of the case at the time settlement was proposed; (7) the extent of discovery that had been conducted; (8) the circumstances surrounding the settlement negotiations; and (9) the experience of counsel in the substantive area and class action litigation. *See Jiffy Lube*, 927 F.2d at 159.

While Plaintiffs' Counsel firmly believes in the merits of Plaintiffs' claims, recovery of money from Defendants posed a number of problems. For example, each of the tribal lending entities asserted entitlement to sovereign immunity. And even if Plaintiffs overcame this defense, the tribal lending entities could transfer their assets to the Tribes, who have absolute immunity absent authorization from Congress or an express waiver. *See, e.g., Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 757 (1998). Further, the tribal lending entities and all defendants

21

would have appealed any adverse decision (as they did in this case), which would have substantially increased the expected duration and expense of additional litigation. Additionally, one of the tribal lending entities, Great Plains, was in the process of winding down operations and the others had reshaped their businesses. In sum, absent approval of the settlement, Plaintiffs will be put to challenging proofs, and all Parties face the prospect of a long and expensive litigation which will likely culminate in a trial on a class-wide basis and, thereafter, a lengthy appeal (not to mention the likelihood of a requested interlocutory appeal relating to class certification under Rule 23(f)). Ex. 2, Kelly Decl. at ¶ 35; Ex. 4, Bennett Decl. at ¶ 23.

The desirability of a Settlement to mitigate against this risk is particularly desirable at this stage in light of the Global Settlement reached with the Think Finance Defendants in the Bankruptcy Proceedings. The momentum and terms achieved by the Parties in the Global Settlement facilitated the Settlement in these cases. Further, it is telling that despite the successful delivery of over one million total notices, not a single Class Member has objected and only nine have requested to be excluded from the class. "Such a lack of opposition … strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.'" *In re Microstrategy*, 148 F. Supp. 2d at 668 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)). As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the settlement and the small number of class members choosing to opt-out of the class strongly compel a finding of adequacy." *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989)). Courts recognize that where the class as a whole

supports a settlement, it should be approved.[9] Indeed, even a small majority of support creates a presumption in favor of approval. *See Reed v. Gen'l Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class action settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement nevertheless approved).

If the Court finally approves the Settlement, then the Class Members will receive genuine relief without the need to show any harm whatsoever. For example, all Class Members will receive non-monetary relief. Approximately 64% of Class Members will also automatically receive monetary payments, which amounts to 668,850 of the 1,045,248 Class Members.[10] And, Class Members believing their cases are even more valuable or who have actual damage claims in excess of these expected awards have had the opportunity to opt-out and pursue those claims on an individual basis. Only nine have done so, further supporting the conclusion that the Settlement is adequate. The absence of any significant opposition to the Settlement, coupled with the lack of any other competing class cases supports the strength of the Settlement.

For these reasons, the opinion of all Counsel involved is that the terms of the Settlement Agreement represent a fair, reasonable, and adequate resolution of the claims alleged. The Court should conclude likewise.

---

[9] *See, e.g.*, *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (finding small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (approving settlement where 20 percent opted out or objected); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (approving settlement with thirty-six objecting); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (granting approval where sixteen percent objected).

[10] As a frame a reference for the Court, assuming a fund of approximately $40 million, Plaintiff Edwards will receive $382.73, Plaintiff Nolte will receive $256.92, Plaintiff Williams will receive $3.80, and Plaintiff Hengle will receive $159.13. Ex. 2, Kelly Decl. ¶ 40.

**B.** **The Court should award the Class Representative service awards, attorneys' fees, and costs.**

      **1. The Court should award the well-earned Service Awards to Plaintiffs.**

Plaintiffs request—and Defendants do not oppose—a modest award of $7,500 each for the Named Plaintiffs' participation in the settled cases and service to the Class. In this case, Plaintiffs took an active role as some answered discovery and testified in depositions. Ex. 2, Kelly Decl. at ¶ 46. The Class Representatives understand their roles as representatives of the class as a whole and were answerable to counsel in prosecuting the case. *Id.* at ¶ 47. And they respectfully request that the Court approve the Settlement. Ex. 4, Bennett Decl. at ¶ 39. Such awards in this amount and range are reasonable and have been regularly approved by judges in the Eastern District of Virginia.[11] Particularly in light of historical service awards both within and outside this District, the service awards sought here are appropriate. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 976–77 (9th Cir. 2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). An empirical study published in 2006 suggests that the average award per class representative is about $16,000[.]" 4 *Newberg on Class Actions* § 11:38 (4th ed.).

---

[11] *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 3:14-cv-258 (JAG) (E.D. Va.); *Manuel v. Wells Fargo Nat'l Ass'n*, No. 3:14cv238(DJN), 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016); *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va.); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO*, No. 3:09CV31-JAG; *Conley v. First Tenn.*, No. 1:10CV1247-TSE (E.D. Va.); *Lengrand v. Wellpoint*, No. 3:11CV333-HEH (E.D. Va.); *Henderson v. Verifications Inc.*, No. 3:11CV514-REP (E.D. Va.); *Pitt v. K-Mart Corp.*, No. 3:11CV697 (E.D. Va.); *James v. Experian Info. Sols.*, No. 3:12CV902 (E.D. Va.); *Manuel v. Wittstadt*, No. 3:12CV450 (E.D. Va.); *Shami v. Middle E. Broadcast Network*, No. 1:13CV467-CMH (E.D. Va.); *Goodrow v. Freidman Freidman & MacFadyen*, No. 3:11CV20 (E.D. Va.); *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11CV274 (E.D. Va.); *Marcum v. Dolgencorp, No.* 3:12CV108 (E.D. Va.); *Kelly v. Nationstar*, No. 3:13CV311 (E.D. Va.); *Wyatt v. SunTrust Bank*, No. 3:13CV662 (E.D. Va.).

There have been no objections to or comments regarding the Service Awards, and Plaintiffs properly earned them through their extensive participation in the case. *Id*. at ¶ 46. The Court should therefore approve the award. *See Manuel*, 2016 WL 1070819, at *6 (approving award of $10,000 for named plaintiff).

## 2. The requested attorneys' fees and costs are appropriate and should be awarded.

The Parties agreed that Class Counsel would seek an award for attorneys' fees, costs, and class administration expenses in an amount not to exceed 33% of the Monetary Compensation portion of the Settlement.

*i. A percentage-of-the-fund award is appropriate and reasonable here.* The Supreme Court has consistently calculated attorneys' fees in common funds cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165–67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478–79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *see also Report of the Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund).

In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Manuel*, 2016 WL 1070819, at *5–6; *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang*, 890 F. Supp. at 502 (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

25

Indeed, the lodestar method is used in only a small percentage of class action cases, usually those involving fee-shifting statutes or where the settlement provides injunctive relief that cannot be reliably calculated. *See, e.g.*, Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (finding the lodestar method used only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (finding the lodestar method used in only 12% of settlements).

This is for good reason. As Vanderbilt Law Professor Brian Fitzpatrick,[12] one of the leading experts on class action attorneys' fees, has explained, the percentage-of-the-fund method is the superior method for awarding attorneys' fees because it "better align[s] the interests of class counsel and the class": "the more the class recovers, the more class counsel are paid." Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010). Class action scholars likewise generally agree that a percentage-of-the-fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement." *See* American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010).

The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 to 40 percent of the settlement fund.[13] This Court has recognized the importance of incentivizing

---

[12] Professor Fitzpatrick is a law professor at Vanderbilt University who focuses his research on class action litigation. He is the author of the most comprehensive examination of federal class action settlements and attorneys' fees that has even been published. *See* Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010). His study has been relied upon by a number of courts, scholars, and testifying experts.

[13] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements demonstrates "average

experienced class counsel to take on risky cases. *See In re Microstrategy*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorneys' fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 31, 33 (2004). This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See In re Thirteen Appeals*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table) (affirming district court's award of 25% of $1 million common fund) (unpublished); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006) (concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys' fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC TV & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of

---

attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted); *Campos-Carranza v. Credit Plus, Inc.*, Case No. 1:16-cv-120 (E.D. Va.) (finding an award of attorneys' fees and costs of 30% to be "reasonable and well within the parameters that are normally found in this jurisdiction").

In this case, a one-third fee amounts to $5,248,227.93, and Counsel requests this amount. Appropriately considered in relation to the total settlement amount, the requested fee award translates to *1% or less* of the total value of the recovery provided for by the Settlement. That is because, together with the debt relief totaling in excess of $380,000,000 and value of the tradeline deletion, the total settlement "would exceed hundreds of millions of dollars. In fact, even using the conservative estimates, the total cumulative value of the settlement would be in the billions of dollars." Ex. 3, Smith Decl. ¶ 24.

As with any class case that they agree to take on, Plaintiffs' Counsel live by the result that they obtain for the Class Members. That is true in cases that yield large fees as well as in cases which result in one below the reasonable lodestar incurred. In this case, where Class Counsel bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, Class Counsel submits that the fee sought is reasonable. Class Counsel has consistently taken the position in all cases that the attorneys' fees should be based on a percentage of the recovery obtained for the class. This has been true even in cases where the result is an objectively small fee such as in *Milbourne v. JRK Residential America, LLC*, No. 3:12-cv-861 (ED. Va.) and *Mayfield v. Memberstrust Credit Union*, 3:07-cv-506 (E.D. Va.), where the class size was so small that counsel's fee ended up being $8,300, well below the actual time counsel had invested in the case. Indeed, in *Conley v. First Tennessee*, 1:10-cv-1247 (E.D. Va.), counsel took this position with respect to a class of 350 consumers and resulted in recovery of an approved fee of only $20,000.

(Conley Doc. 37). The same is true in another case, *Lengrand v. Wellpoint*, No. 3:11-cv-333-HEH (E.D. Va.) (Doc. 42), in which counsel requested only 20% of the class recovery, $8,550, where the class size was very small. In each case, the standards of Rule 23 demand that Class Counsel represent the interest of the class with the same attention, zeal, and competence whether the class is in the millions or not.

   *ii. A cross-check against Counsel's lodestar confirms the requested fee is reasonable.* A cross-check is not required to determine the fairness of a fee when the percentage-of recovery method is used. However, courts have, on occasion, requested information regarding an estimate of Class Counsel's lodestar as a cross-check in determining the percentage of the common fund that should be awarded. *Manual for Complex Litigation (Fourth)* § 21.724.

   Here, the requested award includes not only Counsel's attorneys' fees, but also expenses Counsel has incurred in prosecuting this case. Class Counsel estimates that its combined lodestar attributable to these cases exceeds $2,196,109.60 in fees. Ex. 2, Kelly Decl. at ¶ 30; Ex. 4, Bennett Decl. at ¶¶ 28, 33; Ex. 5, Haac Decl. at ¶ 19, 38. Class Counsel has also incurred $132,894.63 in expenses prosecuting this case for which it has not been reimbursed. Ex. 2, Kelly Decl. at ¶ 30; Ex. 4, Bennett Decl. at ¶ 32; Ex. 5, Haac Decl. at ¶ 34. Counsel's expenses include ordinary costs that are passed on to clients such as transcript processing, research fees, depositions, and mailing, to name a few categories. **Neither the lodestar nor the costs discussed in this motion has been submitted to the United States Bankruptcy Court for the Northern District of Texas, and Plaintiffs here have done their best to separate and allocate time between the two matters.**

   Counsel's hourly rates are reasonable for this District and complex, class action litigation. In *Berry v. LexisNexis*, Class Counsel submitted a lodestar-based fee request, placing their hours expended and hourly rates—comparable rates to those attributed to this case—before Judge Spencer for decision. Ex. 4, Bennett Decl. at ¶ 31. Judge Spencer approved the requested award,

which included a risk multiplier of 1.99, and the Fourth Circuit approved that award in full. *Id.*; *see Berry*, 807 F.3d at 617.

The requested multiplier is reasonable in light of the results achieved. Multiplying the hours reasonably expended by Counsel's hourly rates, Plaintiff's Counsel's lodestar attributed to this case is $2,196,109.60, with costs of $132,894.63, totaling 2,329,004.23. The requested 5,248,227.93 fee thus represents a 2.25 multiplier on the value of the time spent. This multiplier is well-within the range of multipliers awarded in similar cases. *See Berry*, 807 F.3d at 617; *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (noting multipliers of up to 19.6); *Steiner v. American Broadcasting Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (affirming fee award where the lodestar multiplier was 6.85); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 U.S. Dist. LEXIS 68419, at *10 (D. Mass. Aug. 3, 2009) (awarding fee with 8.3 multiplier); *Hainey v. Parrott*, 2007 WL 3308027, at *1 (S.D. Ohio Nov. 6, 2007) (same with 7.47 multiplier); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (finding that requested fee amount with a lodestar multiplier of 7.89 was not unreasonable "[g]iven the outstanding settlement in this case and the noticeable skill of counsel"); *In re Charger Commc'n, Inc., Sec. Litig.*, No. MDL 1506, 4:02CV1186CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005) (approving lodestar multiplier of 5.61); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (awarding fee with 15.6 multiplier); *In re Doral Financial Corp. Securities Litigation*, No. 05-cv-04014-RO (S.D.N.Y. Jul. 17, 2007) (same with 10.26 multiplier); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (approving a multiplier of 4.7 in a case that only involved document review,

and was resolved without any depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding lodestar multiplier of 6.96 despite the fact that the parties engaged mostly in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y 2002) (describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *In re WorldCom, Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005) (awarding multiplier of 4). Particularly in light of the result achieved, the requested fee is a reasonable, appropriate award for this case. Notably here, the Class was made aware of the proposed fee, and none expressed opposition to either figure.

## V.    CONCLUSION

The Settlement is an excellent result considering the contentiousness of the litigation and the lengthy litigation process. The terms of the Settlement, as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigating this case through the completion of trial and appeal, satisfy the strictures for final approval.

Respectfully submitted,

**PLAINTIFFS**

By:____*/s/ Leonard A. Bennett*_____
Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

31

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of November, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

By:   */s/ Leonard A. Bennett*
Leonard A. Bennett, Esq., VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com